Karen Y. PAULY, Executrix of the Estate of Daryl Lynn Pauly; Karen Y. Pauly, Individually; Jean Katherine Pauly; and Patrick Kristopher Pauly, Appellants,

v.

Phillip K. CHANG, M.D.; Timothy W. Mullett, M.D.; Raeford Brown, M.D.; Paul DePriest, M.D.; Barbara Schnapf; the University of Kentucky Medical Center; and the University Hospital of the Albert B. Chandler Medical Center, Inc., Appelles,

and

Phillip K. Chang, M.D.; and Timothy W. Mullett, M.D., Cross–Appellants,

v.

Karen Y. Pauly, Executrix of the Estate of Daryl Lynn Pauly; Karen Y. Pauly, Individually; and Jean Katherine Pauly, Cross–Appellees.

NO. 2014–CA–000404–MR, NO. 2014–CA–000451–MR

Court of Appeals of Kentucky.

RENDERED: DECEMBER 11, 2015; 10:00 A.M.

MODIFIED: DECEMBER 23, 2015; 10:00 A.M.

Discretionary Review Denied by Supreme Court September 15, 2016

Briefs for Appellees/Cross–Appellants, Phillip K. Chang, M.D. and Timothy W. Mullett, M.D.: Steven G. Kinkel, Melanie S. Marrs, Lexington, Kentucky.

Briefs for Appellants/Cross–Appellees: William R. Garmer, Jerome P. Prather, Lexington, Kentucky.

Brief for Appellees, Raeford Brown, M.D.; Paul DePriest, M.D.; Barbara Schnapf; The University of Kentucky Medical Center; and The University Hospital of the Albert B. Chandler Medical Center, Inc: Bradley A. Case, Michael C. Merrick, Stephen J. Mattingly, Louisville, Kentucky.

BEFORE: CLAYTON, COMBS, AND DIXON, JUDGES.

*OPINION*

DIXON, JUDGE:

Appellants/Cross–Appellees, the Estate of Dr. Daryl Lynn Pauly and his heirs, individually, appeal from a judgment of the Fayette Circuit Court following a trial wherein the jury returned a unanimous verdict in favor of Appellees/Cross–Appellants, Phillip K. Chang, M.D. and Timothy W. Mullett, M.D., in this medical malpractice and wrongful death action. Appellees, University of Kentucky Medical Center and University Hospital of the Albert B. Chandler Medical Center, Inc. (collectively "UKMC"), as well as three of its employees, Raeford Brown, M.D., Paul DePriest, M.D., and Barbara Schnapf, R.N., were dismissed prior to trial on grounds of governmental and qualified official immunity. In addition, Appellees/Cross–Appellants, Phillip K. Chang, M.D., and Timothy W. Mullett, M.D., appeal from an order of the trial court excluding the testimony of Vince Sayre, an accident reconstructionist, concerning Dr. Pauly's comparative fault in causing the accident that led to his injuries and subsequent treatment. For the reasons set forth herein, we affirm the trial court.

On December 8, 2005, Daryl Pauly, a fifty-year-old physician, was injured when a bucket truck he was using to trim trees at his home tilted, causing him to fall approximately thirty feet to the ground. Pauly's daughter was home at the time and called 911. Upon arriving at the UKMC emergency room, Dr. Pauly had a Glasgow Coma Scale score of six (6), indicating a brain injury. In addition, Dr. Pauly was diagnosed as having suffered extensive chest trauma and multiple pelvic fractures. Shortly after his arrival in the emergency room, Dr. Pauly's case was upgraded to "Trauma Alert Red" the highest level of alert, thus putting the trauma team on notice of the potential need for

surgery. A head and chest CT scan was ordered; however during the course of performing the head CT to diagnose the severity of any brain injury, Dr. Pauly's condition deteriorated to the point that he had to be removed from the scanner for resuscitative efforts before the chest scan was completed.

In light of Dr. Pauly's instability and the internal bleeding coming from potentially numerous sources, Dr. Chang ordered an angiogram, which revealed that Dr. Pauly had suffered at least one tear to his aortic artery. Dr. Mullett, a cardiothoracic surgeon, then ordered Dr. Pauly returned to the emergency department for monitoring until an operating room and staff were available. However, while waiting for an operating room, Dr. Pauly went into cardiac arrest and subsequently died from a transected aorta.

On December 8, 2006, Appellants filed an action in the Fayette Circuit Court against UKMC, Dr. Brown, Dr. DePriest, and Schnapf, alleging wrongful death, loss of spousal consortium and loss of parental consortium based upon allegations that Appellees failed to diagnose his aortic injuries and get him into the operating room sooner. Subsequently on May 1, 2007, Appellants filed their complaint against Dr. Chang and Dr. Mullett. The two actions were thereafter consolidated into the instant matter. At the time of trial in January 2014, Dr. Chang and Dr. Mullett were the only two defendants remaining as all other parties had been dismissed on grounds of sovereign and governmental immunity. At the close of all evidence, the jury returned a unanimous defense verdict. Following the denial of their motion for a new trial, Appellants appealed to this Court as a matter of right. Additional facts are set forth as necessary in the course of this opinion.

■ Appellants first argue that the trial court erred in ruling that UKMC was entitled to dismissal on grounds of governmental immunity. Appellants contend that UKMC does not satisfy the two-prong test set forth in *Kentucky Center for the Arts Corp. v. Berns,* 801 S.W.2d 327 (Ky.1990), or the third prong of the analysis established in *Comair, Inc. v. Lexington–Fayette Urban County Airport Corp.,* 295 S.W.3d 91 (Ky.2009), and is therefore not entitled to immunity. Essentially, Appellants in focusing on the test set forth in *Berns,* contend that UKMC cannot be immune from liability because (1) it does not operate under the control of the "central state government" and (2) it performs a proprietary rather than essential governmental function.

Contrary to Appellants' assertion, *Withers v. University of Kentucky,* 939 S.W.2d 340 (Ky.1997), and its progeny are binding precedent and are dispositive of this issue. In *Withers,* the appellants brought a claim for wrongful death against UK and physicians who were allegedly agents of UK. The claims against UK were dismissed by the circuit court based on sovereign immunity and that dismissal was affirmed by this Court. *Id.* at 342. On discretionary review, the Supreme Court of Kentucky was asked to determine if UK had sovereign immunity and, if it did, whether UK had waived that immunity by participating in a medical malpractice compensation fund. In finding that UK was entitled to immunity, the Court held:

> Contrary to appellants' contention, the University of Kentucky precisely meets the *Berns* test as set forth above. While we deem it unnecessary to repeat the analysis of the statutory existence of the University of Kentucky as contained in *Hutsell v. Sayre,* [5 F.3d 996 (6th Cir. 1993) ], it is appropriate to quote KRS [Kentucky Revised Statutes] 164.100 as follows:

The University of Kentucky located at Lexington, is recognized as established and maintained. It is the institution that was founded under the land·grant of 1862 by the Congress of the United States under the corporate designation and title of "Agricultural and Mechanical College of Kentucky." The university shall be maintained by the state with such endowments, incomes, buildings and equipment as will enable it to do work such as is done in other institutions of corresponding rank, both undergraduate and postgraduate, and embracing the work of instruction as well as research.

In addition, KRS 164.125(2) provides:

The University of Kentucky shall be the principal state institution for the conduct of statewide research and statewide service programs and shall be the only institution authorized to expend state general fund appropriations on research and service programs of a statewide nature financed principally by state funds.

The language of KRS 44.073(1) establishes the University of Kentucky as an agency of the state and KRS 446.010(31) defines "state funds" or "public funds" in such a manner as to include sums paid to the University of Kentucky Medical Center for health care sciences.

Numerous other statutes contained in KRS 164 establish unmistakably that the University of Kentucky operates under the direction and control of central state government and that it is funded from the State Treasury. The immune status of the University of Kentucky was expressly recognized in *Frederick v. University of Kentucky Medical Center*, Ky.App., 596 S.W.2d 30 (1980), a case involving the same statutory provision here under review, and likewise recog-

nized in the leading case, *Dunlap v. University of Kentucky Student Health Services Clinic*, Ky., 716 S.W.2d 219 (1986). Even appellant virtually concedes the immune status of the University of Kentucky. Thus, on the basic question of whether the University of Kentucky is entitled to sovereign immunity, we have no reluctance to answer in the affirmative.

*Id.* at 343.

As do Appellants herein, the appellants in *Withers* argued that UK should be stripped of its immunity because its medical center performs a proprietary function in that it is nothing more than a hospital which is in full competition with and performs the same function as private hospitals. The *Withers* Court rejected this argument, explaining,

The answer to this contention is simple. The operation of a hospital is essential to the teaching and research function of the medical school. Medical school accreditation standards require comprehensive education and training and without a hospital, such would be impossible. Medical students and those in allied health sciences must have access to a sufficient number of patients in a variety of settings to insure proper training in all areas of medicine. Such is essential to the mandate of KRS 164.125(1)(c).

*Id.*

Although *Withers* only specifically addressed UK's immunity, it is clear from a reading of the opinion as a whole that UK's immunity extends to UKMC. In fact, the *Withers* Court noted that UKMC was essential to UK's mandate to provide postdoctoral studies in medicine as set forth in KRS 164.125(1)(c), *id.* at 343, which is indicative that UKMC has governmental immunity.

As Appellants point out, in recent immunity cases, our Supreme Court has moved away from the strict adherence to the two-part *"Berns* test" in favor of a more general "governmental function" test. As noted by the Court in *Comair, Inc. v. Lexington–Fayette Urban County Airport Corp.,* 295 S.W.3d at 99, "[t]he more important aspect of *Berns* is the focus on whether the entity exercises a governmental function, which that decision explains means a 'function integral to state government.' " (Citation omitted). Yet contrary to Appellants' assertion, this "refocused" approach only strengthens the decision in *Withers* as it has clearly been determined that "notwithstanding the fact that [UKMC] competes with private hospitals, its essential role in the teaching mission of the University of Kentucky College of Medicine rendered its activities governmental." *Breathitt County Board of Education v. Prater,* 292 S.W.3d 883, 887 (Ky.2009). *See generally Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001).

Opinions from this Court have likewise reinforced *Withers* and its progeny. In *Charash v. Johnson,* 43 S.W.3d 274 (Ky. App.2000), a decedent's widow brought a medical malpractice claim against several physicians, a nurse, and the UKMC. The trial court dismissed the claims against the UKMC based on sovereign immunity. In affirming the trial court on this issue on appeal, the panel of this court held that the issue of UKMC's entitlement to sovereign immunity "has been settled by the Supreme Court, which held in *Withers v. University of Kentucky* that UKMC enjoys sovereign immunity." *Charash,* 43 S.W.2d at 276 (footnote omitted). *See also Garrison v. Leahy–Auer,* 220 S.W.3d 693, 699 (Ky.App. 2006) ("UKMC is entitled to governmental immunity in this case based upon our Supreme Court's holdings in *Yanero* and *Withers,* as the functions of the UKMC in question were governmental.")

Based on the above precedent, we must conclude that UKMC is entitled to governmental immunity and the trial court properly granted its motion to dismiss.

■ Appellants likewise argue that the trial court erred in granting summary judgment in favor of Dr. Raeford Brown, Dr. Paul De Priest, and nurse Barbara Schnapf, on qualified immunity grounds. Appellants named the three UKMC medical providers in their administrative capacities at the time of Dr. Pauly's treatment: Dr. Raeford Brown is an anesthesiologist who was the Medical Director of Anesthesia Services; Dr. DePriest, is a gynecologic oncologist who was the Medical Director for Surgical Services; and Barbara Schnapf is an operating room nurse who was the Director of Preoperative Services. There is no dispute that none of the three directors were (1) consulted regarding the request for an operating room for Dr. Pauly; (2) involved in any manner in preparing an operating room or obtaining staff for emergency cardiac surgery for Dr. Pauly; (3) present during Dr. Pauly's treatment; or (4) even aware that, on the night in question, Dr. Pauly had been brought to UKMC. Nevertheless, Appellants sought to hold them liable for their alleged failure to provide a staffed operating room for emergency cardiac surgery on Dr. Pauly after his aortic transection was diagnosed. Specifically, Appellants claimed that the directors failed to properly implement certain policies and procedures pertaining to operating room availability for emergency trauma patients. Appellants now argue in this Court that the trial court's determination that they exercised discretionary functions in implementing operating room (OR) policies was erroneous because such functions are, in fact, ministerial in nature under Kentucky Law.

In *Yanero v. Davis*, 65 S.W.3d at 521–522, the Kentucky Supreme Court explained:

"Official immunity" is immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions. It rests not on the status or title of the officer or employee, but on the function performed. *Salyer v. Patrick*, 874 F.2d 374 (6th Cir.1989). Official immunity can be absolute, as when an officer or employee of the state is sued in his/her representative capacity, in which event his/her actions are included under the umbrella of sovereign immunity as discussed in Part I of this opinion, *supra.* Similarly, when an officer or employee of a governmental agency is sued in his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled, as discussed in Part II of this opinion, *supra.* But when sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment. 63C Am. Jur.2d, *Public Officers and Employees*, § 309 (1997).

In reviewing the pleadings and video record herein, we do not find an instance where Appellants contradict the directors' assertion that they were sued only in their administrative or representative capacities. In fact, in their response objecting to the directors' motion for leave to file an amended answer asserting immunity, Appellants specifically stated, "it was clear from the Complaint that the claims were brought against each of the Movants in their capacity as an employee of the University of Kentucky who had administrative responsibility for the operating rooms at UKMC." Thus, to the extent that Appellants sought to hold the directors liable solely in their administrative capacities, they would be entitled to the same immunity that their employer, UKMC, is entitled to. *Id.* at 521. *See also Autry v. Western Kentucky University*, 219 S.W.3d 713 (Ky.2007).

■ Nevertheless, it is clear from the trial court's comments during the summary judgment hearing that it considered and resolved the immunity issue as if the directors had been sued in their individual capacities. In so doing, the trial court concluded that their actions as hospital administrators in the areas of training and education of policies were discretionary, thus also entitling them to qualified immunity. We agree.

■ As previously noted, public officers and employees sued in their individual capacities enjoy qualified official immunity when they negligently perform "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d at 522. Therefore, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). Application of the defense, "rests not on the status or title of the officer or employee, but on the [act or] function performed." *Yanero* at 521, (citing *Salyer v. Patrick*, 874 F.2d 374 (6th Cir.1989)). Indeed, the analysis depends upon classifying the particular acts or functions in question in one of two ways: discretionary or ministerial.

"Discretionary acts are, generally speaking, 'those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.'" *Haney v. Monsky,* 311 S.W.3d 235, 240 (Ky.2010) (quoting *Yanero,* 65 S.W.3d at 522). "Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Upchurch v. Clinton County,* 330 S.W.2d 428, 430 (Ky.1959) (quoting 43 Am.Jur., *Public Officers* § 258). In other words, discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. In contrast, "ministerial acts or functions—for which there are no immunity—are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Haney,* 311 S.W.3d at 240 (quoting *Yanero,* 65 S.W.3d at 522).

Dr. Brown explained that at the time of Dr. Pauly's accident and treatment at UKMC, his medical director position was not part of any OR chain of command and he did not have any authority over OR staff. Similarly, Dr. DePriest stated that in his role as Medical Director of Surgical Services, he primarily acted "as a liaison between surgeons and the hospital administration, the nursing administration, and the other groups in the hospital that interact in the OR setting." As with Dr. Brown, Dr. DePriest stated that he had no authority over OR availability for particular individuals. Finally, nurse Schnapf testified that she was generally responsible for several areas related to pre-op, post-op, and the surgery itself; however she had no involvement in making sure an OR was available in emergency cases. Her written job description stated that the Director of Perioperative Services "collaborates with Depts. Of Anesthesia and Surgery to set standards and policies, and procedures and monitor adherence to those policies that will ensure a high level of patient care in the OR." Schnapf's job description did not, however, specify any directions, orders or instructions as to how she was to execute her responsibility to collaborate on setting and monitoring the adherence of policies.

Appellants' expert, a hospital administrator named Arthur Shorr, opined that the directors were negligent by (1) "failing to ensure that the Protocols, Policies and Procedures in effect were fully implemented"; (2) "failing to ensure that all personnel charged with the responsibility of carrying out the Protocols, Policies and Procedures, including but not limited to, the Trauma Red Alert Policy and the Operating Access Policy, were properly trained to carry out these policies"; and (3) "failing to ensure that the Federal regulations on OR access were properly carried out." At his deposition, Shorr confirmed that his criticism of the directors concerned their failure to properly implement the OR Trauma Policy and the Adult Trauma Alert policy. However, Shorr cited to no evidence that any of the directors were personally responsible for the development or implementation of these policies. In fact, the evidence indicates that both policies originated from UK's Section of Trauma and Critical Care, of which none of the directors is a member. Furthermore, the evidence demonstrated that policy implementation at UKMC is a shared function left to the discretion of a myriad of individuals in

different departments, divisions, and sections.

We find Appellants reliance on *Gould v. O'Bannon*, 770 S.W.2d 220, 222 (Ky.1989), and the unpublished decision from this Court in *Osborne v. Aull*, No. 2010–CA–001073–MR, 2012 WL 3538276 (Aug. 17, 2012), misplaced. Quoting the *Gould* Court's holding that "[t]he administration of medical care is a ministerial function by employees, including doctors[,]" Appellants argue that there is no reason that the law should be any different when the hospital employee was acting in an administrative or managerial capacity. We disagree. Unlike the facts herein, *Gould* concerned the qualified immunity of *treating* doctors at state-owned hospitals and in no manner addressed employees in administrative positions such as the directors herein.

In the *Osborne* case, an inmate sued the jailer and three nurses for failing to diagnose and treat his diabetes. The trial court ruled that none of the plaintiffs were entitled to official immunity in their individual capacities. On appeal, a panel of this Court affirmed. With respect to the nurses, the panel stated,

> [T]he nausea and vomiting protocol supposedly in force at the Daviess County jail required the nurses to contact a physician if the inmate's symptoms persisted for more than 24 hours. This straightforward requirement imposed a ministerial duty on the nurses. The fact that the nurses apparently falsified the medical records on two occasions in order to make it appear that they had contacted Dr. Byrd further confirms this conclusion. Therefore, the defense of qualified official immunity is not available to the nurses because their actions in treating Aull were ministerial. [Slip op. p.6].

With respect to the jailer, the panel determined that the promulgation of the medical protocols by the jailer was a discretionary function. Ensuring that the nurses observed and followed the protocols, however, was a ministerial function on the part of the jailer. The Court analogized the jailer's role to that of the coaches in *Yanero*, wherein the Supreme Court held that the coaches' enforcement of a rule requiring student athletes to wear helmets during batting practice was a ministerial function. *Id.* Because the nurses both testified that the protocols were no longer in effect and the jailer testified that he believed that they were, the *Osborne* court concluded that there remained a factual dispute as to whether Osborne enforced the protocols. *Id.*

We find the facts herein more akin to those presented in *Wales v. Pullen*, 390 S.W.3d 160 (Ky.App.2012), wherein a plaintiff who was injured when his motorcycle struck a tree lying in the roadway sued a county engineer and the Louisville Metro's Director of Public Works for alleged negligence in failing to remove the tree. A panel of this Court held that because a Kentucky statute specifically required the county engineer to remove fallen trees, his duty was ministerial rather than discretionary. *Id.* at 166. However, with respect to the Director, the panel concluded that his functions were discretionary, despite the fact that he had a duty to "ensure implementation of the department's policies" and that he acknowledged he had not informed the engineer that tree removal was part of his job. The panel explained:

> As the director of public works, Pullen presided over a department with eight divisions and nearly 800 employees. As Director, Pullen testified that he was responsible for the direction of the department as a whole and that he ensured the implementation of Public Works' goals, budgets, and policies. He

was also responsible for analyzing data on the effectiveness and efficiency of the programs and ensuring maximum utilization of available resources. We agree with the trial court that none of these duties involve obedience to the orders of others or the execution of any specific act, such that they are ministerial in nature. Thus, Pullen's duties were discretionary in nature under *Yanero.* Accordingly, Pullen was entitled to qualified immunity[.]

*Id.* at 167.

Unlike *Osborne* and *Yanero,* this case does not involve a rule that was subject to enforcement. The OR access and trauma alert policies were not clear cut mandates, unlike the medical protocol in *Osborne* or the helmet rule in *Yanero.* The policies herein were guidelines for use at the discretion of the treating physicians and nurses. Significantly, the directors neither promulgated the policies nor had any "enforcement" authority. Even Appellants' expert acknowledged that the process of policy education and implementation necessarily involved the exercise of judgment and discretion.

Based on all of the evidence presented, including Appellants' own expert's testimony, we agree with the trial court that the directors' functions with respect to the policies at issue were purely discretionary rather than ministerial. Unlike the enforcement of a rule, the implementation of the policies necessarily involved the exercise of judgment and discretion and did not involve obedience to the orders of others or the execution of any specific act. Because Appellants have not claimed that the directors acted in bad faith, they are entitled to qualified immunity for their discretionary acts.

Appellants next challenge the trial court's exclusion of evidence pertaining to UK's Interdepartmental Trauma Quality Conference ("Trauma Conference") Assurance Review and the written analysis of Dr. Pauly's treatment at UKMC. Appellants sought to admit the evidence to prove Appellees' negligence by showing that had Dr. Pauly's aortic transections been discovered and addressed in a timelier manner, he would have survived.

The Trauma Conferences are held six times a year and are intended to meet the American College of Surgeons' ("ACS") requirements for a verified Level 1 trauma center, such as exists at UKMC, and also to satisfy ACS's requirement for a functioning Trauma Peer Review Committee. Appellees point out that the Trauma Conference does not evaluate any particular doctor's compliance with the standard of care, but rather performs an analysis of the process and systems involved in an effort to ascertain whether there are additional safety measures that may be undertaken or whether an alternative process could be implemented. The main trauma and critical care issues are identified and certain conclusions are reached using the required ACS criteria of "nonpreventable," "preventable," or "potentially preventable."

At the time of Dr. Pauly's review, minutes of the Trauma Conferences were generated by Dr. Paul Kearney, Chief of the Section of Trauma and Critical Care in the Division of General Surgery, and Lisa Fryman, Trauma Nurse Coordinator. Testimony established that the participants of the Trauma Conference do not have any input into the creation of the minutes and that such are not distributed to the participants after they are drafted. The minutes are maintained in a confidential file and do not contain patient identifiable information in accordance with HIPPA requirements for patient privacy.

On January 18, 2006, the circumstances of Dr. Pauly's case were discussed at the

Trauma Conference. Both Dr. Chang and Dr. Mullett were present during the review. As part of its summary findings, the Trauma Conference minutes referenced what it called an "[u]nderrecognition . of need for an early chest CT" and issues with the OR access policy in place at that time. The minutes classified the case as "potentially preventable."

In response to a request for production of documents and after ensuing appellate review as to the discoverability of the minutes, UKMC produced the minutes of the Trauma Conference review of Dr. Pauly's case. Appellees thereafter filed a motion in limine to preclude the admission of or testimony pertaining to the minutes at trial. On the morning of trial, the trial court granted Appellees' motion in limine to exclude evidence of the Trauma Conference Review and subsequent minutes, citing their inadmissibility under the Rules of Evidence and also the policy of promoting quality healthcare by encouraging such reviews. At the time of Dr. Mullett's testimony, Appellants moved the trial court to reconsider its ruling and permit them to impeach him by use of the Trauma Conference minutes. The court denied the request indicating that the minutes were neither authored by Dr. Mullett nor did they include any statement attributable to him that would subject either to impeachment.

In this Court, Appellants argue that the trial court erred in excluding evidence relating to the Trauma Conference because

(1) it was relevant to their case-in-chief as it demonstrated that Appellees rendered treatment that was below the required standard of care; (2) it was admissible for the purpose of impeaching Dr. Mullett; and (3) it should have been deemed admissible on public policy grounds.

■■■■■■ As Appellees point out, Kentucky is only one of two states that even permit discovery of peer review documents in a subsequent civil action.[1] Appellees do not cite to, and we have found no cases directly on point addressing the admissibility of such evidence at trial. However, simply because the information is discoverable does not necessarily mean that it is relevant or admissible. As noted by our Supreme Court in *Ewing v. May*, 705 S.W.2d 910, 912 (Ky.1986),

> CR [Kentucky Rules of Civil Procedure] 26.02 provides that the parties may obtain discovery of any matter not privileged which is relevant to the subject matter in the pending action. Relevancy is more loosely construed for purposes of discovery than for trial. It is not necessary that the information sought be admissible as competent evidence at trial. Even though it might be otherwise incompetent and inadmissible, information may be elicited if it appears reasonably calculated to lead to the discovery of admissible evidence. It is allowable if there is a reasonable possibility that the information sought may

---

1. In *Sisters of Charity Health Systems, Inc. v. Raikes*, 984 S.W.2d 464, 470 (Ky.1998), the Kentucky Supreme Court held that the peer review privilege created by KRS 311.377(2) is limited to suits against peer review entities and does not extend to malpractice suits:

 We have no doubt that in creating a peer review privilege, the General Assembly's intent and purpose was *not* to hinder an aggrieved patient's search for the truth in a medical malpractice suit against a negligent

physician or hospital. The Preamble to the 1990 Act plainly states that it was enacted for the protection of peer review participants. Appellants, in their capacity in the cases at bar as party-defendants in a medical malpractice suit, are not included in this class because they have not been sued for any action taken in the course of performing a peer review. Simply put, the statute was not enacted for the protection of defendants in a medical malpractice suit.

provide a lead to other evidence that will be admissible.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable[.]" Kentucky Rules of Evidence (KRE) 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

Appellants claim that evidence pertaining to the Trauma Conference was relevant because it made it more probable that Appellees deviated from the standard of care in diagnosing and treating Dr. Pauly's aortic injury than it would have been without the evidence. We must disagree.

■■■■ "[I]n Kentucky a physician has the duty to use the degree of care and skill expected of a competent practitioner of the same class and under similar circumstances." *Grubbs v. Barbourville Family Health Center*, P.S.C, 120 S.W.3d 682, 687 (Ky.2003). In a medical negligence case, the plaintiff is required to provide expert testimony to prove that the treatment at issue fell below the standard of care expected of reasonably competent providers, and that such negligent care proximately caused the plaintiff's injuries. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky.1982). Indeed, in this case, expert testimony was presented on both sides as to whether Appellees complied with the requisite standard of care. However, we must disagree with Appellants that the evidence relating to the Trauma Conference was also relevant to Appellees' standard of care.

Dr. Kearney, who as previously noted was responsible for drafting the minutes of the conference, testified that the purpose of the Trauma Conference was to conduct a "highly critical" examination that exceeded any standard of care analysis. Dr. Kearney explained that the conference was designed to address system improvement and did. not evaluate any individual doctor's compliance with the requisite standard of care. Appellants' own CT surgery expert, Dr. Robert Hagberg, agreed with Dr. Kearney's characterization of the conference during his testimony:

Q: In participating in the M & Ms (morbidity and mortality) reviews, you're not necessarily looking at whether or not there was compliance with the standard of care, you're looking at almost a higher level of care and trying to determine if there is anything we can do better?

A: I would say that's true.

Although the Trauma Conference found that there was an under-recognition of a need for an early CT of the chest, the minutes do not reflect when such an under-recognition occurred or to what doctor the analysis pertained. As Appellees point out, the decision to remove Dr. Pauly from the CT scanner prior to obtaining the chest CT due to his instability was made by physicians that are not parties to this case. Thus, even if we were to agree with Appellants that the Trauma Conference concluded that a deviation from the standard of care occurred, there is insufficient information to know whether the deviation applied to either or both Appellees.

■■■■ Assuming, *arguendo*, that evidence pertaining to the Trauma Conference was relevant, we nevertheless believe that any probative value is outweighed by the danger of unfair prejudice and confusion of the jury. The Trauma Conference minutes did not contain any information that was directly relevant to the specific issue of whether Dr. Chang or Dr. Mullett

deviated from the standard of care in their diagnosis and treatment of Dr. Pauly and, thus, the minutes would have served no other purpose than to confuse the jury.

 Nor do we believe that the Trauma Conference minutes constituted proper impeachment evidence. Appellants argue that the minutes were relevant to refute Dr. Mullett's testimony at trial that Dr. Pauly suffered two, rather than one, aortic transections. Appellants point out that Dr. Mullett did not mention in his operative notes of Dr. Pauly's emergency thoracotomy that he had suffered two tears and there is no indication that he presented such information to the Trauma Conference. Thus, Appellants contend that the Trauma Conference's findings that the case was "potentially preventable" contradicted Dr. Mullett's testimony that Dr. Pauly's aortic injuries were so severe that he could not have survived.

We do not find anything in the minutes to contradict Dr. Mullett's testimony. The Trauma Conference minutes merely state that "[t]he angio revealed aortic laceration in the distal thoracic aorta." There is no reference as to the number of lacerations nor is there any indication that Dr. Mullett made a contrary statement during the Trauma Conference. Therefore, we conclude that the trial court properly denied Appellants' request to use the Trauma Conference minutes for impeachment purposes.

 Appellants next argue that the trial court erred in limiting evidence relating to another patient (referred to at trial as "Patient A") who arrived at the UKMC emergency department shortly after Dr. Pauly's death with substantially the same injuries yet survived. Patient A was also treated by Dr. Mullett who successfully repaired an aortic transection. Prior to trial, Appellees sought to exclude any reference to Patient A. The trial court denied

that request, ruling that Appellants would be permitted to talk, in general terms, about the care that Patient A or other patients received on the same day as Dr. Pauly.

At trial, however, Appellants attempted to admit Patient A's medical records as evidence of "the disparity in the diligence, care, and procedure by which the two patients were treated." The trial court ruled that while Appellants could generally discuss Patient A, the medical records were not admissible. Appellants contend herein that evidence and testimony about Patient A were relevant because it demonstrated Appellees' ability and knowledge to successfully treat a patient with nearly identical injuries when they abide by the appropriate standard of care. We disagree.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." KRE 401. Further, pursuant to KRE 404(b) evidence of collateral acts is generally inadmissible except:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent ... mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that the separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Relying upon the decisions in *Massie v. Salmon*, 277 S.W.2d 49 (Ky.1955), and *Meece v. Commonwealth*, 348 S.W.3d 627 (Ky.2011), Appellants argue that the evidence in question was admissible to demonstrate Appellees' knowledge and competency, and because Patient A's treatment occurred just minutes after Dr. Pauly was treated, the evidence ruled out any argu-

ment that the circumstances in the emergency department were in any manner different during each patient's care.

The record indicates that Patient A was a restrained driver in a motor vehicle accident who presented to UKMC with different injuries and medical histories. Appellants sought to prove Appellees' negligence by showing that if Dr. Pauly's aortic transection had been discovered and repaired as timely as Patient A's was, then he would have survived. However, we must agree with Appellees that Appellants did nothing more than attempt to isolate two procedures and compare the time in which they were performed, without consideration of any other factors, particularly Dr. Pauly's overall condition at the time he was brought into the UKMC Emergency Department. The trial court correctly concluded that it was not the jury's responsibility to compare Dr. Pauly and Patient A; rather it was to determine whether Dr. Pauly received substandard care. We agree with the trial court that while general information about Patient A's treatment was relevant, the medical records would have served no purpose other than to confuse the jury.

▮▮▮ Appellants next argue that the trial court erroneously excluded a substantial portion of the deposition of Dr. William Brooks, relating to his opinion of Dr. Pauly's potential future abilities had he survived. Specifically, in a pretrial pleading, Appellants identified Dr. Brooks as a "rebuttal expert witness" who would offer the following two opinions: (1) "The CT scan performed on Dr. Pauly provided no information that would delay any emergent potentially life-saving surgical procedure[;]" and (2) "There is no evidence in the medical record that Dr. Pauly's head injury would have been fatal." At trial, however, Appellants sought to introduce during their case-in-chief Dr. Brooks' opinion concerning the extent of Dr. Pauly's brain injury and that such would not have resulted in any permanent damage that would have prevented him from returning to work. Appellees objected on the grounds that Dr. Brooks' opinion was outside the scope of Appellants' CR 26.02 disclosure. The trial court excluded the testimony, noting that Dr. Pauly's brain injury had not been raised as an issue in the trial.

Appellants argue in this Court that they were entitled to present Dr. Brooks' testimony at any time despite him being listed as a rebuttal expert and despite the fact that they concede the purpose of his testimony was to rebut the opinion of Appellees' expert, Dr. Jeoffery Young, that due to the extent of Dr. Pauly's brain injury, he would have died regardless of the care provided to him at UKMC. Notably, Dr. Young had not testified at the time Appellants sought to introduce Dr. Brooks' testimony.

▮▮▮ A "trial court is vested with wide discretion in determining [whether] to admit or exclude expert testimony." *Jones v. Stern,* 168 S.W.3d 419, 424 (Ky. App.2005). Our standard of review of a trial court's ruling as to admitting or excluding evidence is limited to determining whether the trial court abused that discretion. *Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky.2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581 (citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999)).

▮▮▮ With respect to an expert's offer of an opinion, CR 26.02(4) requires parties to disclose, upon request before trial, "facts known and opinions held by experts," including, "the subject matter on which the expert is expected to testify, and

... the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." CR 26.02(4)(a)(i). The purpose of the rule is to allow the opposing party to adequately prepare for the substance of the expert's trial testimony.

Appellants mistakenly contend that the trial court's ruling was based solely upon the insufficient CR 26.02 disclosure. Indeed, within its scheduling order, the trial court had set separate deadlines for the identification of expert witnesses and rebuttal expert witnesses. Appellants complied with the deadlines by disclosing their primary experts on May 31, 2012, and their rebuttal expert, Dr. Brooks, on December 6, 2012. Therefore, it would have certainly been within the trial court's discretion to limit Appellants to the experts they identified to be presented during their case-in-chief. *Fraser v. Miller*, 427 S.W.3d 182, 184 (Ky.2014); *see Love v. Walker*, 423 S.W.3d 751 (Ky.2014). Nevertheless, a review of the video reflects that the trial court actually ruled that because there had been no evidence put forth as to the extent of Dr. Pauly's brain injury or his anticipated functioning level had he survived, there was nothing for Appellants to rebut. Thus, Dr. Brooks' testimony on that issue was not relevant at the time Appellants sought to introduce it. The trial court specifically stated, however, that it would revisit the issue if Dr. Young testified to his opinion or if Dr. Pauly's brain injury was otherwise made an issue in the case.

 "Rebuttal evidence is evidence that 'tends to counteract or overcome the legal effect of the evidence for the other side.'" *Fraser*, 427 S.W.3d at 184. It is axiomatic that if there is no evidence to discredit then there is nothing to rebut and the evidence sought to be introduced is inadmissible. Given that at the time

Appellants sought to introduce Dr. Brooks' deposition there had been no evidence put forth as to Dr. Pauly's brain injury, we cannot conclude that the trial court abused its discretion in excluding the rebuttal testimony.

 Appellants next argue that the trial court committed palpable error when it failed to give an admonition after defense counsel informed the jury during closing arguments that it could reach a verdict without deliberating. Specifically, during his forty-five minute closing argument, defense counsel stated:

> You will be instructed to elect a foreperson and if you want, do what you want, but you can take a vote to see how everyone stands. You all have heard the evidence but you haven't talked about it or anything like that but you all have heard the evidence. You can take a vote. If you are 9 to 3 or better you can come back to the courtroom. You've reached a verdict, or you can discuss things as long as you want to, you can talk about the rest of the day if you want to. Whatever you want to do. But if you, if you obviously have a verdict you can bring it back. If you are for Dr. Chang and Dr. Mullett please hold firm to your opinion. You are individuals. You are intelligent individuals. You've heard the evidence and you have a right to your opinion. And if you are for them, stick to your opinion. Please, for them, I ask you.

Appellants concede that this issue is not preserved but nevertheless contend that the error resulted in manifest injustice warranting review. We disagree.

 "Opening and closing statements are not evidence and wide latitude is allowed in both." *Wheeler v. Commonwealth*, 121 S.W.3d 173, 180 (Ky.2003) (*citing Slaughter v. Commonwealth*, 744

S.W.2d 407 (Ky.1987)). However, closing arguments calculated to arouse the passions and prejudices of the jury are not looked favorably upon in Kentucky. *See Clement Brothers Co. v. Everett*, 414 S.W.2d 576, 577 (Ky.1967). Nevertheless, "counsel cannot remain silent and then rely upon the claim that the argument was improper." *Rodgers v. Cheshire*, 421 S.W.2d 599, 602 (Ky.1967). *See also Greathouse v. Mitchell*, 249 S.W.2d 738, 741 (Ky.1952) ("An objection to the remarks and conduct of counsel must be made at the time and a ruling had thereon, else they cannot be considered on appeal.").

 Contrary to Appellants' argument, we do not construe defense counsel's statements as a suggestion that the jury should render a verdict without deliberation. Furthermore, it is clear from the record that the jury did, in fact, deliberate before returning a unanimous defense verdict. Nevertheless, Appellants sat through the entirety of opposing counsel's closing argument without objection. Such failure operates as a waiver of the argument on appeal. Moreover, Appellants' claim that the issue should be reviewed for palpable error under CR 61.02 is without merit. In *Carrs Fork Corp. v. Kodak Mining Corp.*, 809 S.W.2d 699, 701 (Ky.1991), our Supreme Court held that "[i]n applying [CR 61.02], palpable error must result from action taken by the court rather than an act or omission by the attorneys or litigants." *See also Burns v. Level*, 957 S.W.2d 218, 222 (Ky.1997). Error, if any, was opposing counsel's allegedly prejudicial statements and/or Appellants' failure to object to such in the trial court. Clearly, such acts or omissions do not equate to palpable error.

 Next, Appellants argue that the trial court should have granted a new trial when evidence came to light that on the final day of trial an article appeared in the *Lexington Herald Leader* entitled "Malpractice Rules Help Push Kentucky Further Down the ER Ranking." The article quoted a local Lexington doctor and noted that, "the state suffered because of a failing grade for issues surrounding medical liability. [Dr. Ryan Stanton] said current law allows for unqualified experts to testify in malpractice cases on behalf of patients and families. Kentucky, he said, has a 'terrible state of medical liability.'" Appellants claim that the article bolstered a major defense theme: namely, that because Appellants' experts were not trauma surgeons, they were not qualified to testify to the standard of care of a trauma surgeon. Further, relying upon the decision in *Briggs v. United States*, 221 F.2d 636 (6th Cir.1955), Appellants contend that it must be presumed that members of the jury read the article and that such was prejudicial to Appellants receiving a fair trial. We disagree.

As the trial court noted during a hearing on Appellants' motion for a new trial, the article did not appear on the front page of the *Lexington Herald* but rather on page eight of the sports section. Furthermore, the majority of the article focused on the substandard quality of care that is provided in Kentucky's emergency rooms, which could certainly be deemed prejudicial to Appellees defense. Finally, the trial court pointed out that because the issue was not raised until the motion for new trial, there was no evidence and no way to determine whether any juror even read the article.

Appellants' citation to the *Briggs* decision is unpersuasive. Therein, the Sixth Circuit Court of Appeals held that newspaper publicity may be of such a character as to result in prejudice to the defendant even if there was no direct evidence that it was read by any jurors. *Id.* at 638–639. Notably, however, the publicity at issue in *Briggs* involved the very case that was

being tried before the court and the media coverage concerned particular witnesses and their testimony. Such is not the case herein. We must agree with the trial court that because the article did not prominently appear in the newspaper and was generally innocuous in its content, no prejudice can be presumed and Appellants were not entitled to a new trial.

Finally, Appellants argue that the trial court erred when it dismissed Patrick Pauly's claim for loss of parental consortium because he was twenty-one years old at the time of his father's death and limited Jean Katherine Pauly's damages for loss of parental consortium to those sustained before her eighteenth birthday. Appellants contend that the Kentucky Supreme Court's decision in *Martin v. Ohio County Hospital Corporation*, 295 S.W.3d 104 (Ky.2009), makes it clear "that neither the court nor the legislature have imposed age limits for a child's claim for loss of parental consortium." Again, we must disagree.

In *Giuliani v. Guiler*, 951 S.W.2d 318, 323 (Ky.1997), our Supreme Court overruled existing precedent and recognized that a minor child may maintain a cause of action for loss of parental consortium. Noting that KRS 411.135 authorizes a parent to "recover for loss of affection and companionship that would have been derived from such child during its minority," the Court determined that a child's "claim of loss of parental consortium is a reciprocal of the claim of the parents for loss of a child's consortium which was recognized in KRS 411.135." *Id.* at 321. However, the Court did not address whether such claim would extend to an adult child.

Since *Giuliani*, this Court has considered whether an adult child has a cause of action for loss of parental consortium. In *Smith v. Vilvarajah*, 57 S.W.3d 839 (Ky. App.2000), the trial court dismissed a claim for damages for the loss of parental consortium filed by the decedent's adult children. On appeal, a panel of this Court addressed whether the *Giuliani* decision should be extended to allow a cause of action for loss of parental consortium brought by emancipated or adult children of a decedent:

> [T]he Supreme Court's opinion in *Giuliani v. Guiler, supra*, set forth specific policy reasons for recognizing [a loss of parental consortium] claim.... The Supreme Court first noted the statutory policy of the Commonwealth to protect and care for children in a nurturing home. KRS 600.010. Clearly, this interest would not be served by extending a claim for loss of parental consortium to emancipated adult children. In addition, the Supreme Court also noted that KRS 411.135 recognizes the individuality of the child and the value to a family by providing parents a consortium claim for the loss of the love and affection of their minor child. *Id.*, 951 S.W.2d at 319. In this case, there is no reciprocity interest because Kentucky statutes do not recognize a parent's claim for loss of consortium with their adult children.
>
> ....
>
> We certainly do not wish to diminish or disparage the close bond which many adult children maintain with their parents. However, ... there is a legitimate basis for limiting recovery for loss of parental consortium to minor or unemancipated children....

After considering the Supreme Court's decision in *Giuliani v. Guiler, supra*, the express language of KRS 411.135 and the authority from other jurisdictions, we decline to extend the claim for loss of parental consortium to emancipated adult children such as the appellants. We conclude that any such step

must be taken either by the legislature or by our Supreme Court.

*Id.* at 842–844.

Similarly, in *Clements v. Moore*, 55 S.W.3d 838 (Ky.App.2000), a panel of this Court held:

> We are not insensitive to the losses experienced by the appellants, losses which are substantially the same as those experienced by their minor sibling. Further, we do not have any reason to believe that the appellants are any less deserving of compensation than other family members merely because they have reached the status of adults. Nevertheless, it is the belief of this Court that it is not the proper function of the judiciary to further develop the common law in the area of loss of consortium claims in the context of wrongful death. Rather, the recognition of filial claims for wrongful death is one exclusively within the purview of the Legislature. Unlike the situation presented in *Giuliani*, there is no "reciprocal" statute to finesse Section 241 of the Kentucky Constitution so as to avoid its clear provisions. While this Court has not hesitated to take an active role in extending the common law of torts when appropriate, we decline the invitation in the case *sub judice* so as not to invade the province of the Legislature, the branch of our government to which our constitution has granted "the [sole] responsibility for determining who can recover what damages for the wrongful death of another."

*Id.* at 840–841 (citations omitted).

Appellants rely on dicta in the *Martin* decision to support their position. Al-though *Martin* addressed a claim of loss of spousal consortium, not parental consortium, the Court observed that *Giuliani* did not expressly restrict a child's claim for loss of consortium:

> It is interesting to note that the statute limits the parents' recovery to the time it would have taken a child to reach majority, but this Court did not specify such a restriction on the child's claim for loss of consortium. The opinion is completely silent as to the duration of the damages.

*Martin*, 295 S.W.3d at 108. Appellants suggest that the above language is indicative that our Supreme Court would allow loss of parental consortium damages beyond the age of majority if the issue was presented and they ask this Court to so hold.

While the *Giuliani* Court did not expressly restrict a child's claim for loss of parental consortium, it did say it was creating a "reciprocal" claim to KRS 411.135. As noted in *Vilvarajah*, however, there is no reciprocity interest under the present circumstances because Kentucky statutes do not recognize a parent's claim for loss of consortium with their adult children. *Vilvarajah*, 57 S.W.3d at 842. Despite our Supreme Court's language in *Martin*, *Vilvarajah* and *Clements* remain the law in Kentucky.[2] Therefore, based upon the present state of the law, this Court declines to extend a child's claim for loss of parental consortium beyond the age of majority.

### CROSS–APPEAL

■ Appellees/Cross–Appellants, Dr. Chang and Dr. Mullett, appeal from the

---

**2.** Since the rendition of the *Martin* decision, *Vilvarajah* and *Clements* have been positively cited as being the law in Kentucky in recent federal decisions. *In re Air Crash at Lexington, Kentucky*, No. 5:07–CV–320, 2009 WL 6056005 (E.D.Ky. November 10, 2009); *Rad-ford v. DVA Renal Healthcare, Inc.*, No. 5:08–CV–00176–R, 2010 WL 4779927 (W.D.Ky. November 16, 2010); *Donais v. Green Turtle Bay, Inc.*, No. 5:10–CV–167–TBR, 2012 WL 399160 (W.D.Ky. Feb. 7, 2012).

trial court's ruling precluding them from introducing evidence as to Dr. Pauly's fault in causing the fall that necessitated his medical treatment. Prior to trial, the defense retained an accident reconstructionist, Vince Sayre, to inspect the involved bucket truck and offer his opinions as to Dr. Pauly's failure to use the truck's stabilizers or a safety harness. The trial court granted Appellants' motion to preclude the testimony, concluding that the evidence was irrelevant to the issues in the case, namely the medical care that Dr. Pauly received at UKMC after the fall.

On appeal, Appellees argue that the trial court's ruling was in contravention of the plain language of KRS 411.182(1) which provides that defendants "in all tort actions" may seek an apportionment instruction against all other negligent parties or settling non-parties. Further, Appellees contend that *Wemyss v. Coleman*, 729 S.W.2d 174 (Ky.1987), and its progeny have established that comparative negligence principles apply to any antecedent or subsequent negligence that enhances the plaintiff's injury. *See also AIK Selective Self Insurance Fund v. Bush*, 74 S.W.3d 251 (Ky.2002), and *Martin*, 295 S.W.3d 104.

The parties do not dispute that there are no Kentucky decisions directly on point. Kentucky courts have ruled that contributory negligence, now comparative negligence, may exist as a defense in a medical negligence case where some conduct of the plaintiff interferes with treatment by the medical provider. *Blair v. Eblen*, 461 S.W.2d 370 (Ky.1970); *Mackey v. Greenview Hospital Inc.*, 587 S.W.2d 249 (Ky. App.1979). In *Ohgia v. Hollan*, 363 S.W.3d 30, 36 (Ky.App.2012), a panel of this Court recognized that "a comparative

negligence jury instruction may be appropriate in a medical malpractice case based on lack of informed consent. However, because of the unique relationship between a patient and physician, the case must be extraordinary[.]"

The overwhelming majority of courts from other jurisdictions addressing the issue herein, however, have held that a patient's antecedent negligence does not constitute comparative or contributory fault in medical malpractice cases.[3] The general rule appears to be that, in order to support a claim of comparative negligence, "a patient's negligence must have been an active and efficient contributing cause of the injury, must have cooperated with the negligence of the malpractitioner, must have entered into proximate causation of the injury, and must have been an element in the transaction on which the malpractice is based." *Jensen v. Archbishop Bergan Mercy Hospital*, 236 Neb. 1, 459 N.W.2d 178, 186 (Neb.1990). Further, the defense of comparative or contributory negligence does not apply when "a patient's conduct provides the occasion for medical attention, care or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care or treatment on which a subsequent medical malpractice claim is based." *Id.* at 187. *See also Martin v. Reed*, 200 Ga.App. 775, 409 S.E.2d 874, 877 (1991) ("patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded.").

**3.** *Contributory Negligence, Comparative Negligence, or Assumption of Risk, Other than Failing to Reveal Medical History or Follow Instructions, as Defense in Action Against Physician or Surgeon for Medical Malpractice*, 108 A.L.R.5th 385 (2003).

In *Mercer v. Vanderbilt University, Inc.* 134 S.W.3d 121,130 (Tenn.2004), the plaintiff argued that his severe and permanent brain injury, resulting from the medical negligence of health care providers, was separate and distinct from the injuries he sustained in an automobile accident that was the result of his own negligence. The defense, in turn, suggested that the decedent suffered one, indivisible injury in that his brain injury occurred during the treatment of those injuries caused by his own negligence. Analyzing the two positions, the Tennessee Supreme Court noted:

> Significantly, no other jurisdiction appears to utilize this indivisible/separate injury approach in determining whether principles of comparative fault or contributory negligence apply to medical malpractice actions. To the contrary, most jurisdictions have held that a patient's negligence that provides only the occasion for medical treatment may not be compared to that of a negligent physician. *See, e.g., Harvey v. Mid–Coast Hosp.*, 36 F.Supp.2d 32 (D.Me.1999) (holding that patient's intentional or negligent ingestion of a drug may not be compared with the defendant physician's subsequent, negligent treatment); *Shinholster v. Annapolis Hosp.*, 255 Mich. App. 339, 660 N.W.2d 361 (2003) (holding that patient's failure to regularly take her blood pressure medication in the year before her death could not be compared with the defendant physician's negligent treatment and diagnosis of her condition); *Harding v. Deiss*, 300 Mont. 312, 3 P.3d 1286 (2000) (holding that patient's negligence in riding a horse when she had asthma and was allergic to horses could not be compared to the defendant physician's failure to immediately intubate her upon her arrival at the hospital); *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990) (holding that patient's

failure to lose weight could not be compared with defendant physician's negligence); *Eiss v. Lillis*, 233 Va. 545, 357 S.E.2d 539 (1987) (holding that patient's negligent ingestion of aspirin and heart medication could not be compared with the defendant physician's negligence).... These jurisdictions conclude that a health care provider may not reduce or avoid liability for negligent treatment by asserting that the patient's injuries were originally caused by the patient's own negligence. The Restatement of Torts reiterates this view. According to the Restatement, "in a case involving negligent rendition of a service, including medical services, a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy." Restatement (Third) of Torts: *Apportionment of Liability* § 7 cmt. m (2000). The reporter's note to this comment explains that it would be unfair to allow a defendant doctor to complain about the patient's negligence because this negligence caused the very condition the doctor undertook to treat. Restatement (Third) of Torts: *Apportionment of Liability* § 7 reporter's note to cmt. m (2000).

*Id.* at 128–129.

We agree with those jurisdictions holding that a plaintiff's negligence that merely provides the occasion for the medical care, attention, and treatment that subsequently results in a medical malpractice action should not be considered by a jury assessing fault. A medical malpractice case is distinctly different from a personal injury case in which the injured party's pre-injury fault may be considered in the apportionment of damages. Here, the issue was not how or why Dr. Pauly was injured but whether, once he arrived at UKMC, Appellees utilized the required

standard of care in his diagnosis and treatment. The fact that a patient has injured himself, negligently or non-negligently, has no bearing on the duty of the hospital and health care providers to treat him in accordance with the appropriate standard of care. As stated by the Colorado federal district court in *Spence v. Aspen Skiing Co.*, 820 F.Supp. 542, 544 (U.S.D.C.Col. 1993):

> Persons providing medical treatment—whether they be hospitals, doctors, nurses, or EMT's—should expect to treat not only patients who fall ill or are injured through no fault of their own, but also those whose own neglect or intentional conduct has placed them in the precarious position of requiring medical treatment. Indeed, the latter category of patients is probably as numerous as the former category. All patients, regardless of how they sustain an illness or injury, may reasonably expect competent treatment from those into whose hands they have placed themselves.... It would be inconsistent with the reasonable and normal expectations of both parties for the court to excuse or reduce the provider's liability simply because it was the patient's own fault that she required care in the first place.

We agree with the trial court herein that this case concerned "the care not the cause" of Dr. Pauly's injuries, and evidence relating to Dr. Pauly's alleged negligence was not relevant. Thus, the trial court properly excluded the testimony of Appellees' accident reconstructionist, Vince Sayre.

For the reasons stated herein, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.