RENDERED:  JUNE 5, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1383-MR

LOUISVILLE CEMENT ASSETS
TRANSITION COMPANY, F/K/A
KOSMOS CEMENT COMPANY;
CEMEX, INC.; AND LONE STAR
INDUSTRIES, INC.                                              APPELLANTS


                        APPEAL FROM JEFFERSON CIRCUIT COURT
v.                      HONORABLE TRACY E. DAVIS, JUDGE
                        ACTION NO. 17-CI-002146


JESSICA SNYDER AS
ADMINISTRATRIX OF THE ESTATE
OF RICHARD JOSEPH SNYDER;
HUELSMAN & SWEENEY
CONSTRUCTION, INC.; JESSICA
SNYDER; MOTORISTS MUTUAL
INSURANCE COMPANY; AND
PEBCO, INC.                                                    APPELLEES

AND


                        NO. 2024-CA-0007-MR

JESSICA SNYDER,
ADMINISTRATRIX OF THE ESTATE
OF RICHARD JOSEPH SNYDER;
JESSICA SNYDER; JESSICA
SNYDER, NATURAL MOTHER AND
NEXT FRIEND OF ALISSA SNYDER,

AVA SNYDER AND SEAN SNYDER,
MINORS; KAREN SNYDER; AND
RICHARD SNYDER                                                    CROSS-APPELLANTS


                    CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.                        HONORABLE TRACY E. DAVIS, JUDGE
                               ACTION NO. 17-CI-002146


BE & K BUILDING GROUP LLC; BE
& K BUILDING GROUP LLC; BE & K
ENGINEERING OF NORTH
CAROLINA; CEMEX INC.; KBR
CONSTRUCTION CO. LLC; KBR
ENGINEERING OF NORTH
CAROLINA; KBR INC.; KOSMOS
CEMENT COMPANY; LONE STAR
INDUSTRIES, INC.; AND PEBCO,
INC.                                                              CROSS-APPELLEES


                                   OPINION
                                  AFFIRMING

                              ** ** ** ** **

BEFORE:  CETRULO, COMBS, AND EASTON, JUDGES.

EASTON,[1] JUDGE:  This is an appeal and cross-appeal of a wrongful death

action.  The circuit court case resulted from a work-related accident causing the

---

[1] These appeals were originally assigned to Judge James H. Lambert as the presiding judge in February 2025 for the panel month of June 2025.  Upon Judge Lambert's retirement, the Clerk randomly assigned the case to Judge Kelly Mark Easton as the presiding judge by Notice entered

death of a contractor at a cement plant.  After a jury trial, the cement plant and the decedent were found to be negligent, with the cement plant being apportioned 95% of fault and the decedent being apportioned 5% of fault.  The jury found no fault on the part of the decedent's employer, or the manufacturer of the equipment involved in the accident.  The jury awarded approximately $25 million in compensatory damages and $25 million in punitive damages.

The Appellants seek a new trial based on several claims, primarily based on evidentiary rulings and jury instructions.  The Appellees/Cross-Appellants seek review of the circuit court's dismissal of a parental loss of consortium claim, as well as denial of their post-trial motions.  Upon a thorough review of the record and the applicable law, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The fatal accident occurred just shy of ten years ago.  In August 2016, Richard Joseph Snyder (Joey) was employed with Huelsman & Sweeney Construction, Inc. (H&S), as a certified rigger and iron worker.  H&S employees regularly worked as independent contractors for Louisville Cement Assets Transition Company, formerly known as Kosmos Cement Company (Kosmos), which is a cement manufacturer.  Kosmos was owned by a partnership consisting

---

in February 2026.  That Notice mistakenly refers to Judge Joseph Lambert instead of Judge James H. Lambert.

of Appellants Cemex, Inc. (Cemex), owning 75% and Lone Star Industries, Inc. (Lone Star), which owned 25%. We will hereafter refer to the Appellants collectively as Kosmos.

Kosmos manufactures the powder for cement on the production side of its plant on Dixie Highway in southern Jefferson County. The cement powder is then transferred across Dixie Highway to the shipping side of the plant located between Dixie Highway and the Ohio River. On the shipping side, the cement powder is loaded onto barges, train cars, and trucks to be shipped to customers. This case involves a particular piece of equipment, a loadout spout, which on the day of the accident was to be used to load cement powder onto barges for transport on the Ohio River. This loadout spout was manufactured by Appellee, PEBCO, Inc. (PEBCO).

This spout is a large hose-like structure and consists of several parts. The spout is attached to a steel frame, and it contains buckets which are surrounded by a canvas shroud. The buckets allow the cement powder to flow downward into the barges, and a shroud surrounding the buckets helps direct the cement powder inside the spout. At the bottom of the spout is an adapter ring, which attaches the shroud to a cone-shaped piece of steel, known as a "carrier." The carrier is then attached to a rubber skirt.

The spout is raised and lowered by three steel lifting cables, which are attached to the top of the structure. They run through pulleys or "sheaves" which allow the cables to lift or lower the spout as needed. On the afternoon of August 8, 2016, one of the cables used to raise and lower the spout had "jumped" out of its sheave and became pinned between a bracket and a sheave, causing the spout to be stuck in the air.

Two Kosmos maintenance employees, Tyler Osbourne (Osbourne) and Jose Madera (Madera), were tasked with replacing the sheave and getting the spout back into operation. Osbourne and Madera determined they needed assistance; this job required more than two Kosmos workers. Under normal circumstances, when a sheave needs to be replaced, the spout would be lowered onto the surface of a work barge to release all the tension in the cables. A worker could then easily, quickly, and safely replace the sheave at ground level.

The next day, August 9, 2016, Joey and another H&S employee, Kevin White (White) were asked by Kosmos's shipping supervisor, Wayne Amburgey (Amburgey), to assist Osbourne and Madera with this job. Because the cables were stuck and the spout could not be lowered, the sheave needed to be replaced while the spout was suspended in the air. To do this, the spout would need to be lifted with chain falls in order to put slack in the cables and release the weight on the sheaves that needed to be replaced.

The men initially attempted to use 2-ton and 3-ton chain falls to lift the spout. They jointly determined those were insufficient, so Joey left the Kosmos plant to go to H&S's shop nearby (in Sellersburg across the river in southern Indiana) to retrieve 5-ton chain falls. Upon his return to the Kosmos plant, Joey and Osbourne worked on rigging the top portion of the spout, where the damaged sheaves were located, while Madera and White rigged the bottom portion of the spout. Joey and Osbourne worked on a narrow "catwalk," while Madera and White worked from a bucket on a raised crane from a work barge. To do this work, the men were approximately forty feet above the river. Once they had the equipment rigged and had introduced slack into the wire cables, they began the process of replacing the sheaves.

The sheaves were badly damaged, and the stuck cable was pinned tightly. In order to get the damaged sheave out, Joey and Osbourne had to hit it with a sledgehammer. Once the damaged sheave was removed, Joey put the first of the new sheaves in place. As Joey was taking the second new sheave from Osbourne, the spout separated at the flange between the adapter ring and the carrier, and the bottom portion dropped.

Osbourne described it as "like a bomb went off." Due to the bottom portion of the spout falling and creating immediate tension in the cable, Joey was caught between the wire cable and the frame of the spout. The cable struck Joey,

-6-

and his neck became lodged between the cable and the machine. Joey essentially suffered a "hangman's fracture," and died within a minute according to the medical testimony.

After the accident, the Mine Safety and Health Administration (MSHA) investigated the accident. Both Kosmos and H&S were cited. While we do not want to make this Opinion any longer than necessary, it is important to understand the multiple causes of the failures that led to Joey's death. To do this, more discussion of the composition of the spout is required, including how it had been altered and maintained.

As previously mentioned, to perform this repair the spout had to be rigged in two locations, one at the top and one toward the bottom on the adapter ring. On the adapter ring, there were several natural lifting points created by the manufacturer. There were also several larger hooks, commonly referred to as "dog ears" (because of their shape) that were added on to the ring by Kosmos after they purchased the spout from PEBCO. On the day of the accident, Joey and the others working on the spout connected the chain falls to the dog ears, rather than the lower lifting points. Evidence at trial indicated that these dog ears should not be used to lift the weight of the entire spout; they were apparently attached to lift only the shroud to get to the buckets beneath.

At the connection point between the shroud adapter ring and the carrier, there were eight bolt holes, in which bolts were to be utilized to secure those two pieces together. After the accident, it was discovered that five bolts were missing, and only three bolts were being used to hold the pieces together. Of the three bolts, two of them were in oversized holes.

Sometime in the past, bolts had been removed using blowtorches which caused the increase in the size and misshaping of the holes. A major source of contention during trial was who was responsible for this failure and who had knowledge that only three of the eight bolts were securing the equipment while the spout was in operation. Expert testimony agreed that had all eight bolts been secured in proper holes, the fatal separation would not have occurred.

It is undisputed that the spout had accumulated several layers of cement buildup. Although the product delivered through the spout was powder, moisture in the air (partly due to proximity to the Ohio River) would cause hardened and heavy cement to build up on parts of the spout. Over time, this process added approximately 13,000 to 20,000 pounds (or approximately 7 to 10 tons) of weight to the spout. The presence of this buildup also prevented seeing the bolt holes and how many bolts were in place.

Proper maintenance called for periodic removal of this cement buildup. There was some dispute as to when the cement buildup had last been

removed and how often it was removed. The parties presented expert testimony that had the extra weight from the accumulated cement not been on the spout on the day of the accident, the three bolts that were used on the carrier would have held.

Joey's widow, Jessica Snyder (Jessica), filed a wrongful death lawsuit against Kosmos, on her behalf as well as on behalf of her and Joey's three minor children, requesting compensatory and punitive damages. Joey's parents, Karen and Richard Snyder, were also named plaintiffs. Kosmos later added Joey's employer, H&S, as a third-party defendant on claims of negligence and seeking both contractual and common-law indemnity.

Years of discovery ensued. Dozens of depositions were taken. The Snyders filed multiple motions to compel when Kosmos would not respond to discovery requests. The parties were before the circuit court myriad times for discovery disputes. The circuit court record consists of just one shy of thirty volumes. The Snyders asked the circuit court to grant sanctions on several occasions. The circuit court reserved the final decision regarding sanctions until after the trial. Even the circuit court's sanctions decision is an issue in this appeal.

In July 2020, Kosmos filed a motion for partial summary judgment, regarding the loss of parental consortium claims brought by Richard and Karen

Snyder. Kosmos argued that KRS[2] 411.135 only allowed loss of parental consortium claims when the deceased child was a minor child, not an adult child. The circuit court agreed, and it granted Kosmos's motion in October 2020 and dismissed Karen and Richard Snyder as parties.

H&S filed a motion for summary judgment on Kosmos's third-party complaint in March 2023. H&S argued that Kosmos is not entitled to common-law indemnity because the contract between the parties addressed indemnity. H&S further argued that the contract regarding indemnity was ambiguous and should be interpreted against the asserted indemnity claim. H&S also insisted that any negligence it may have committed was secondary to Kosmos's negligence. The circuit court denied this motion pre-trial, but it granted a directed verdict to H&S on the indemnity claims after the Snyders had concluded their case at trial. It denied H&S's motion on negligence (at least for apportionment purposes), as it determined a jury should decide the question of negligence by H&S. The jury eventually found no negligence by H&S.

Prior to trial, the Snyders voluntarily dismissed claims against PEBCO on strict liability for manufacturing or design defects and breach of warranty. The only claim against PEBCO that remained for trial was failure to warn. PEBCO moved for summary judgment on this claim, which the circuit court

---

[2] Kentucky Revised Statutes.

denied, as it determined there were genuine issues of material fact to be resolved by the jury on this question.

Multiple motions *in limine* were filed by both the Snyders and Kosmos, which we must discuss in more detail in our analysis. These motions were a significant and continuing source of disagreement between the parties during the trial and remain a source of contention.

A jury trial finally started on June 12, 2023. The trial lasted for fourteen trial days. Thirty-six witnesses testified. Witnesses included employees of Kosmos, Cemex, H&S, several expert witnesses, Jessica, and two of Joey's children. The case was submitted to the jury on June 29, 2023. The jury reached a verdict after approximately five and one-half hours of deliberation.

The jury unanimously determined that Kosmos failed in both their duty of ordinary care and in their duty to warn of hidden defects and dangers, and that these failures were substantial factors in causing Joey's death. They found unanimously that PEBCO and H&S did not fail in their duties. Nine of the twelve jurors determined that Joey failed to comply with his duty to exercise ordinary care for his own safety. The jury apportioned 95% of the fault to Kosmos and 5% of the fault to Joey with 0% apportioned to PEBCO and H&S, consistent with the finding of no negligence by those parties. The jury awarded $5 million to the Snyders for Joey's loss of earning capacity, $1.5 million for Joey's pain and

suffering, $10 million to Jessica for loss of consortium, and $3 million for each child for their loss of parental consortium. The jury further found that Kosmos's conduct constituted oppression, fraud, malice, or gross negligence, and awarded $25 million in punitive damages.

Kosmos filed a motion for Judgment Notwithstanding the Verdict (JNOV) and/or New Trial in July 2023, as well as a Motion to Alter, Amend, or Vacate regarding the dismissal of its third-party indemnity claim against H&S. Additionally, the Snyders filed a renewed motion for sanctions, requesting attorney's fees for Kosmos's discovery violations throughout the tortuous course of the case.

In September 2023, the Snyders filed a motion to amend their Complaint, to add three insurance companies as defendants for purposes of asserting claims for bad faith and under the Unfair Claims Settlement Practices Act (UCSPA). In a Consolidated Opinion and Order entered on November 15, 2023, the circuit court denied all the post-trial motions. The parties then timely filed their appeal and cross-appeal. Additional facts and testimony will be set forth below as they become necessary for our analysis. The briefs filed by the parties are sufficiently compliant with the Kentucky Rules of Appellate Procedure to not require comment.

# ANALYSIS

## Appeal 2023-CA-1383

## EVIDENTIARY DECISIONS

Kosmos's first contention of error is that the circuit court both improperly included and excluded various evidence, and so they claim they are entitled to a new trial. "A trial court's decision regarding the admissibility of evidence is reviewed for an abuse of discretion." *Ross v. Commonwealth*, 455 S.W.3d 899, 910 (Ky. 2015). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

## EXCLUDED EVIDENCE

We will first consider the evidence Kosmos claims the circuit court excluded but should have allowed. Kosmos presented Joey's toxicology screen, which was performed as part of his autopsy. The autopsy revealed that Joey had methamphetamine in his blood. His urine screen also contained the presence of buprenorphine and prescription opiates which had been processed though his body. The urine levels would have indicated past use but not necessarily any effect at the time of Joey's death. The circuit court determined this evidence presented much more danger of unfair prejudice when compared to its probative value, and it did not allow the jury to hear it.

-13-

This ruling was first addressed by the Snyders' motion *in limine*, but it was revisited several times throughout the trial. Prior to its initial ruling, the circuit court asked Kosmos if any witness's deposition testimony revealed any indication that Joey was intoxicated, under the influence, or was otherwise impaired at the time of the accident. Kosmos was unable to present any witness testimony that Joey appeared to be impaired or acting in any way other than he normally did on the day of the accident. Kosmos offered expert testimony that the levels of methamphetamine in Joey's blood would have led him to be impaired to some extent, at least with respect to his judgment. Kosmos's expert further stated that methamphetamine impairment is not always observable, particularly to lay persons.

Kosmos argued that this evidence should have been admitted in order for Kosmos to show that Joey made errors in judgment on the day of the accident that led to his death when the carrier fell. Kosmos's theme during the trial was that the accident was not caused by Kosmos's negligence, but rather by the bad decisions of Joey and other H&S employees.

First, Kosmos attempted to point to Joey as the person who decided to rig on the dog ears rather than the manufacturer's intended lifting points. But there was undisputed testimony by several of the men working with Joey that it was a group decision, and they all agreed to rig there. Several Kosmos employees

-14-

testified that they did not know they were not supposed to rig on the dog ears, because they had often seen others rig there. There was also testimony that the original and perhaps more proper lifting points were covered by cement buildup and could not be used because of this.

Next, Kosmos contended that Joey was standing in a "pinch point" while he was rigging at the top. Kosmos presented some testimony that Joey should not have been standing where he was, and that by positioning himself where he did, he placed himself in a dangerous position. But again, several other riggers and employees who worked on the spout testified that there was no other location where Joey could have stood to perform the job he was doing. And the evidence showed that the stuck position of the spout presented to Joey resulted from actions and inactions of Kosmos, not anything Joey could have exercised discretion about at that point.

KRE[3] 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

> There are three basic inquiries that must be made by the
> trial court when making a determination under KRE 403:
> (i) assessment of the probative worth of the evidence
> whose exclusion is sought; (ii) assessment of the

---

[3] Kentucky Rules of Evidence.

-15-

probable impact of specified undesirable consequences likely to flow from its admission (i.e., "undue prejudice, confusion of the issues, or misleading the jury, . . . undue delay, or needless presentation of cumulative evidence"); and (iii) a determination of whether the product of the second judgment (harmful effects from admission) exceeds the product of the first judgment (probative worth of evidence).

*Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012).

The circuit court ultimately ruled this evidence inadmissible. That court deemed this evidence substantially more prejudicial than probative, as there was no evidence that suggested the outcome would have been any different if Joey had not had any drugs in his system. The circuit court once commented that even if Joey was "high as a kite" on the day of the accident, that was not the cause of his death.

We do not agree with the hyperbole expressed by the circuit court on this point, but we note that the comment properly focuses on the probative value of the evidence offered. No one offered specific evidence about how Joey's chronic pain conditions and his medication history would have impacted his tolerance for medications or methamphetamine for that matter. All the evidence supported only the conclusion that there was no actual impairment that day that would have changed anything as far as what happened.

This is not a driving-under-the-influence situation. In that criminal context, no impairment in driving ability even needs to be shown. *Hayden v.*

-16-

*Commonwealth*, 766 S.W.2d 956 (Ky. App. 1989). Guilt can be shown based on presumptions from levels of alcohol in the blood. KRS 189A.010. Not so in this civil case. The levels of methamphetamine here did not justify a presumption but still required proof of impairment to have substantial probative value.

Kosmos still argues strenuously that Joey's drug use was relevant to show that Joey failed in his duty to exercise care for his own safety. But the circuit court gave Kosmos an opportunity to present evidence that Joey appeared or acted impaired in any way on the day of the accident, and it was unable to do so. Kosmos was still able to present evidence that Joey may have made errors in judgment on the day of the accident, albeit without framing it in terms of impairment due to illegal or prescription substances.

With this understanding of the small probative value of the evidence as presented to the circuit court, countervailing factors must be considered. "The language of KRE 403 is carefully calculated to leave trial judges with extraordinary discretion in the application and use of KRE 403." *Probus v. Commonwealth*, 578 S.W.3d 339, 347 (Ky. 2019) (internal brackets omitted). The circuit court in this instance determined evidence of Joey's substance use was much more prejudicial than probative.

Without question, evidence of the methamphetamine in Joey's blood presented a danger of undue prejudice. With the lack of other evidence to tie this

evidence to actual impairment impacting Joey's decisions or actions that day, the jury would be invited to look on the claims presented with a character assessment of Joey as an illegal drug user. This also confuses the issues for the jury to determine. The question was still whether Joey in fact made poor decisions that day, and other evidence addressed that question. Presenting the evidence about methamphetamine in these circumstances would also have been a waste of time in a case that already required an exceptional amount of time to present.

We cannot say that the circuit court here abused its discretion in excluding this evidence. Kosmos may have been able to convince another judge to come to a different conclusion, but that does not necessarily equate to an abuse of discretion:

> Regardless, in most cases, a discretionary decision will be a close one, at least from the appellate perspective, and will not be disturbed by an appellate court unless it "'is firmly convinced that a mistake has been made.'" *Walters* [*v. Moore*, 121 S.W.3d 210, 215 (Ky. App. 2003)] (quoting *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995)). An appellate court can only reverse the trial court's decision if it is sure that the decision is incorrect—any doubts must be resolved in favor of the trial court:
>
>> If there is doubt about the correctness of his ruling, it must be upheld. If the record supports his ruling, it will not be reversed. Even if in our opinion the record would more strongly support a different conclusion, if there is substantial reason for his decision, then he has not clearly erred.

*CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 72–73 (Ky. 2010) (citation omitted).

Kosmos additionally argues it should have been allowed to present evidence of Jessica's relationships after Joey's death. Specifically, it claims it should have been allowed to question Nick Wolfe (a Kosmos employee) in more detail about his connection with Jessica to determine bias or credibility. Further, Kosmos argues it should have been able to ask Jessica about her current engagement.

As for Jessica's brief relationship with Nick Wolfe, Kosmos was allowed to ask some limited questions on this topic. And while Kosmos was limited in its questioning, the evidence presented out of the presence of the jury indicated the relationship between Jessica and Wolfe was very brief and not of lasting significance. It was not an abuse of the court's discretion to allow but limit Kosmos's questioning on this issue, which was for impeachment purposes only. The jury heard that Nick and Jessica had some brief connection and could assess credibility accordingly.

Regarding Jessica's current relationship and living situation, Kosmos does not address in its brief precisely what point it was trying to make. It simply makes a conclusory statement that her engagement and living situation were relevant to her loss of consortium claim. "It is not our function as an appellate court to research and construct a party's legal arguments[.]" *Hadley v. Citizen*

*Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005). Regardless of the reasoning, we note that Joey's death occurred almost seven years prior to the trial. It was not an abuse of discretion for the circuit court to determine that Jessica had a right to move forward in her life and that any current relationship had little to no relevance to her loss of consortium claim. Jessica lost her husband and the father of her children. Her claim has "everything to do with the relationship that was wrongly taken away from the surviving spouse." *Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104, 111 (Ky. 2009). That unique relationship is not somehow replaced with a relationship with someone else.

## ADMITTED EVIDENCE

Next, Kosmos argues the circuit court allowed the introduction of evidence that should have been excluded under KRE 404(b), "other bad acts" evidence. Kosmos complains that the circuit court allowed the Snyders to bring in evidence of other fatalities that occurred at the Kosmos plant, MSHA violations, occasions of "near misses," retaliation for employees reporting safety violations, a "poor safety culture," and the focus on "production over safety." Kosmos argues this evidence had limited probative value and was unduly prejudicial and should have been excluded.

The jury heard from several Kosmos employees, who testified to a lack of a preventative maintenance schedule, how maintenance requests were often

ignored, and that they perceived production as being a higher priority than safety. For example, several employees testified they were aware of the cement buildup on the spout, but they did not know how much cement had accumulated on it. At least one employee testified that, when he was shown a picture of the spout completely clean of excess cement, he did not recognize it as the same spout.

Several Kosmos employees testified that the sheaves Joey was changing the day of the accident had been making a noise for a few weeks prior to the accident. Brad Wright (Wright) testified that the accident was preventable; if management had approved lowering to a work barge and changing the sheaves when the noise first started, the cables would not have gotten stuck, and the accident would not have occurred. But summer is Kosmos's busiest season, and management did not want to stop production.

There was testimony about two other fatalities that occurred at the Kosmos plant. In one instance, an elevator door opened but the elevator was not there, and a contractor fell down the shaft and died. Wright testified it was known to Kosmos employees that the elevator was broken, but it was not necessarily known by the contractors. In another instance, a flagger was hit by a car on Dixie Highway. In addition to these fatalities, there was testimony about several "near misses," in which the potential for severe injury or death was present, but fortunately did not occur.

Tim Rawlings (Rawlings), another contractor with H&S, spoke about a few of these instances. Rawlings told about the day a Kosmos electrician told him to get his guys out of the bag house because it was about to be turned on; had it been turned on with men inside, they would have been "crumpled like a piece of paper." Rawlings said about Kosmos, "they preached safety," but did not follow through, and "when production goes down, all they talk about is getting back up."

Part of the relevance of the prior incidents was the reaction by Kosmos. Although incident reviews were called for to address these prior incidents, they were not done. Had incidents been investigated, Kosmos would have been more mindful of dangerous situations like the one which killed Joey, and they could have been avoided. For example, the failure to maintain the elevator caused a death. Had that incident been properly investigated, Kosmos would have been reminded of its maintenance duties, including the duty to remove excess concrete from the spout. But Kosmos instead ignored multiple opportunities to learn from its mistakes.

KRE 404(b) states:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

The circuit court determined that, for most of the admitted evidence, both exceptions applied. In its Consolidated Opinion and Order dated November 15, 2023, which denied Kosmos's motion for new trial, it stated this about Kosmos's "prior bad acts:"

> Again, Kosmos would like to focus (here) solely upon the events of August 08 and 09, 2016, and the 1631 loadout spout. Of course, there is less evidence that Kosmos did anything negligent at that time and place. However, as set forth above, the failure of the loadout chute and flange separation resulting in Mr. Snyder's death was **caused** by events which occurred far in advance of August 09, 2016. The Plaintiffs' theory of the case was that Mr. Snyder's death resulted from Kosmos's failure to provide a safe workplace and its failure to perform regular maintenance on the loadout chute. An overarching theme presented at the trial was that Kosmos was motivated by profits and production, and that it prioritized production over the maintenance of its equipment and the safety of its workers and independent contractors.
>
> The Plaintiffs did **not** offer evidence of Kosmos's prior accidents, near misses, and MSHA citations to prove **actions in conformity** therewith. Rather, this evidence and the other testimony regarding Kosmos's prioritizing production over safety, went directly to *why* the barge loadout chute was placed back in operation with only three of the eight necessary bolts, and *why* Kosmos operated the chute with an accumulation of seven to ten tons of cement buildup on the shroud. It went to explain why Kosmos continued to use the barge loadout chute for

-23-

five months—between March and August 2016—after a work order was submitted for changing out the sheaves and cables on March 03, 2016—with a priority level of "within one week." It explained why routine maintenance was not performed on the chute. It explained why Kosmos opted to attempt to repair the chute in mid-air, as opposed to attempting to lower it to a barge. This evidence was relevant for a legitimate purpose, probative, and its probative value substantially outweighed any prejudicial effect. *Trover v. Estate of Burton*, 423 S.W.3d 165, 173 (Ky. 2014).

These were not "prior bad acts" offered to prove that Kosmos acted in conformity therewith. This was not evidence offered to prove that Kosmos was allegedly negligent previous [sic] and therefore was more likely to have been negligent on August 09, 2016. While it is true that this evidence tended to "depict the plant as a dangerous place to work" even though not directly related to the loadout chute itself, that *was* Plaintiffs' theory of the case. In short, this evidence provided Kosmos's motive, opportunity, intent, knowledge, and absence of mistake, **and** was "inextricably intertwined" with Plaintiffs' other evidence such that separation could not be accomplished without serious adverse effect on the Plaintiffs' case. The Court perceives no such error in its admission.[4]

(Emphasis in original.)

Kosmos is correct in that KRE 404(b) is meant to be "exclusionary in nature." *Southworth v. Commonwealth*, 435 S.W.3d 32, 48 (Ky. 2014) (citing *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994)). But Kosmos would like the evidence to be limited to only what occurred on August 8 and 9, 2016. That does

---

[4] Consolidated Opinion and Order, November 15, 2023, Trial Record (TR) at pages 4317-4319.

not tell the whole, relevant story. While the accident that caused Joey's death occurred on August 9, 2016, the causes of that accident began long before that date. Much of the testimony Kosmos claims should have been excluded is directly related to relevant motive, opportunity, and, most relevantly, knowledge. We also agree with the circuit court that most of the evidence is so inextricably intertwined with the Snyders' other evidence that it could not be separated without severely hampering their presentation of the case.

Again, circuit courts have wide discretion regarding the admission of evidence. "The test is not whether an appellate court would have decided the matter differently, but whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion." *Porter v. Allen*, 611 S.W.3d 290, 294 (Ky. App. 2020). We cannot say that the circuit court's analysis led to an abuse of discretion.

Also, we point out that the presence of a claim for punitive damages can change the balance in the KRE 404(b) analysis. The Snyders were entitled to present evidence that, while not solely connected with the single accident in question, was separately relevant to the factors the law requires a jury to consider when awarding punitive damages.

Kosmos argues these prior bad acts were not admissible for the purpose of evaluating punitive damages. KRS 411.186 governs assessment of punitive damages, and it states:

> (2) If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then assess the sum of punitive damages. In determining the amount of punitive damages to be assessed, the trier of fact should consider the following factors:
>
> (a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;
>
> (b) The degree of the defendant's awareness of that likelihood;
>
> (c) The profitability of the misconduct to the defendant;
>
> (d) The duration of the misconduct and any concealment of it by the defendant; and
>
> (e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.[5]

Much of the evidence Kosmos wanted excluded, even if it had not been directly relevant to determining the cause of Joey's accident itself, is relevant for the purpose of considering punitive damages. For example, the Snyders elicited testimony from multiple individuals who worked at the Kosmos plant that they believed Kosmos prioritized production and profits over the safety of the workers, and they gave some specific examples of instances that led to that belief.

---

[5] Kosmos did not challenge Instruction No. 16 which required the jury to consider these factors.

-26-

Tim Rawlings testified to several "near-misses" which had the potential to cause serious injury or death. Multiple employees testified that they reported issues with maintenance that were not addressed in a timely manner, or at all. Brad Wright testified to his belief that the plant was unsafe because they had three deaths in three years. It was after this testimony that the circuit court gave an admonition to the jury that prior incidents can only be considered for the general safety culture that existed at the plant; the circuit court explicitly told the jury that these prior incidents could not be considered as to what occurred with Joey. While some testimony may not have been admissible to prove negligence by Kosmos in causing Joey's death, it was still admissible for the sake of determining punitive damages.

The same analysis applies to Kosmos's next claim of error, that the circuit court improperly allowed evidence of Kosmos's post-accident conduct. It is perhaps charitable to even call it post-accident conduct as it occurred while the situation was still ongoing. There was testimony that *several* workers heard Tom Kyser, the Kosmos manager, make a statement to the effect of wanting to get back into production as quickly as possible and inquiring how long it would take to get Joey's body down from the spout. Kyser vehemently denied making any statement like this.

While certainly prejudicial, this statement again goes to the mindset of Kosmos employees even on the day Joey died and is not unfairly prejudicial. This same thought process had led to the series of events which caused Joey's death. The concern over making money with uninterrupted work was expressed while Joey's body was hanging over the scene. This shockingly insensitive comment, if the jury believed it had been made, was admissible for the purpose of assessment of punitive damages.

There was also evidence presented that Kosmos failed to complete any post-accident investigation or root cause analysis of this incident as with prior incidents. There was testimony that failure to do so was a violation of Kosmos's own internal policies. There was also evidence that MSHA required Kosmos to do their own independent investigation. It is not inappropriate to consider a company's own policies and procedures and their compliance with them when considering punitive damages. *See Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985). *See also Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508, 515 (Ky. 2021).

Finally, Kosmos argues the circuit court erred in allowing evidence of the spout's inoperable safety features. Several Kosmos employees testified as to several features of the spout that had been intentionally disabled or were otherwise not functioning at the time of Joey's death. For example, several employees

testified that certain switches that prevented the spout from being lifted too high were regularly turned off, as well as "tilt probes," which were mechanisms to monitor the flow of concrete into the barges. Kosmos argues that these features were not designed to prevent injury to people but were there only for operational uses. That was a fact question for the jury. There was testimony that all these features were related, and if something did not work, it affected the entire system and had the potential to lead to injury and in this case death. Overall, it was not an abuse of discretion for the circuit court to allow this testimony.

The general complaint by Kosmos about all this evidence is that the circuit court essentially bought into the theory of a bad safety culture and that this is not a proper way to evaluate its negligence in this case or in the assessment of punitive damages. Other than a couple of distinguishable Kentucky cases, Kosmos cites to a few unpublished cases from other states to support this theory. Of course, unpublished cases from other states explaining different situations are of little value in an assessment of Kentucky law. Yet we will address this argument briefly.

For example, Kosmos cites *Davis v. Fisher Single Family Homes, Ltd.*, 231 S.W.3d 767 (Ky. App. 2007). This case stands only for the proposition that evidence of other conduct cannot be offered "solely" to prove negligence on a later occasion. *Id.* at 777. The evidence offered in the present case was not so

untethered to what happened to Joey. It was connected causally to the circumstances presented on the day of the accident.

In one of the out-of-state cases cited by Kosmos, the court rightly evaluated the need of other evidence to have some "propensity-free chain of reasoning" for its admission. *Holder v. Interlake Streamship Co.*, No. 16-CV-343-WMC, 2018 WL 1725694, at *12 (W.D. Wis. Apr. 10, 2018). The court excluded a single incident about an accident involving use of a crane in a case that was about toxic exposure, not an accident. The court then made this cogent comment: "Perhaps a string of violations of various kinds in the same time frame might support plaintiff's argument that Capstan had *a mindset of indifference to worker safety*, but a single, additional violation—even a serious one, occurring around the same time—is nothing more than evidence of propensity, especially where the similarities are relatively remote." *Id*. (emphasis added).

The circuit court here maintained a difficult balance in the unique circumstances of this case. Again, we cannot find an abuse of discretion in the overall rulings of the circuit court on evidence of other acts admitted in this case.

**JURY INSTRUCTIONS**

Kosmos's next argument is that the circuit court erred in its jury instructions. "While we evaluate the trial court's decision to instruct on a specific claim for an abuse of discretion, the substantive content of the jury instructions

-30-

will be reviewed *de novo*." *Gribbins v. Commonwealth*, 483 S.W.3d 370, 373 (Ky.

2016).

First, Kosmos claims the circuit court erred in its instructions on

Kosmos's duty. The circuit court gave two instructions to the jury regarding

Kosmos's duty of care. Instruction No. 5 stated:

> It was the duty of Kosmos Cement Company, through its
> agents, servants, and employees, to operate and maintain
> the Kosmos Cement Plant using ordinary care.
>
> Are you satisfied from the evidence that Kosmos Cement
> Company failed in this duty and that such failure was a
> substantial factor in causing injury to and the death of
> Joey Snyder?

Instruction No. 6 stated:

> It was the duty of Kosmos Cement Company as the
> owner of the premises, to warn an independent
> contractor, such as Joey Snyder, of hidden or latent
> defects and dangers that (a) Kosmos Cement Company
> knew, or had reason to know about, and (b) Joey Snyder
> did not know about and could not have discovered for
> himself.
>
> Are you satisfied from the evidence that Kosmos Cement
> Company failed in this duty to warn Joey Snyder of
> hidden defects and dangers, and such failure was a
> substantial factor in causing injury to and the death of
> Joey Snyder?

Kosmos argues that it was error to give the jury a general "ordinary

care" instruction. It argued that as a premises liability case with Joey's status as an

independent contractor, Kosmos's only duty to Joey was to warn of hidden dangers

-31-

of which he was unaware and could not discover.  This duty was covered by Instruction No. 6.

We note that Kentucky courts and litigants often reference the "proposition that Kentucky has adopted a 'universal duty of care' under which 'every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury.'"  *Howard v. Spradlin*, 562 S.W.3d 281, 286 (Ky. App. 2018) (quoting *Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987), *superseded by statute as stated in DeStock No. 14, Inc. v. Logsdon*, 993 S.W.2d 952 (Ky. 1999)).

More recently our Supreme Court observed that "Kentucky does not recognize a general 'universal duty of care' that goes 'beyond the most general expression of negligence theory.'"  *New Albany Main Street Properties, LLC v. Stratton*, 677 S.W.3d 345, 351 (Ky. 2023) (quoting *Jenkins v. Best*, 250 S.W.3d 680, 691 (Ky. App. 2007)).  Ordinary care is defined as "such care as a reasonably prudent person would exercise under the circumstances."  *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (quoting *Slusher v. Brown*, 323 S.W.2d 870, 872 (Ky. 1959)).  While this duty may be labeled "universal," it is not without bounds.  *See T&M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 531 (Ky. 2006); *Lhotsky as Next Friend for Lhotsky v. Sutcliffe*, 723 S.W.3d 842, 851 (Ky. App. 2025).

The jury in this case unanimously answered "Yes" to both Instructions 5 and 6. Even if the giving of Instruction No. 5 was in error, which we do not believe it was, it was harmless, as the jury also unanimously found Kosmos liable under Instruction No. 6. "Appellants alleged multiple tortious acts, and the trial court eventually instructed on three theories against the hospital based on those alleged acts . . . . Regardless of the route taken to liability, the injury under all three claims was the same—the death of Mrs. Shreve." *Martin v. Ohio County Hospital Corp.*, 295 S.W.3d 104, 115 (Ky. 2009). "[B]ecause the jury verdict found liability for wrongful death on all three theories of causation, this error is harmless because the damages claimed and proven were for the same personal injury." *Id.* at 116.

Next, Kosmos argues the circuit court erred in its instructions regarding the duties of Joey and H&S. The instructions the circuit court gave to the jury are as follows:

Instruction No. 9

It was the duty of Huelsman & Sweeney Construction, Inc., by and through its agents, servants, and employees, to exercise ordinary care in performing services at the Kosmos Cement Plant, and to train and supervise its employees.

Are you satisfied from the evidence that Huelsman & Sweeney Construction, Inc. failed to comply with this duty, and that such failure was a substantial factor in causing injury to and the death of Joey Snyder?

-33-

<u>Instruction No. 10</u>

It was the duty of Joey Snyder to exercise ordinary care for his own safety while working at the Kosmos Cement Plant.

Are you satisfied from the evidence that Joey Snyder failed to comply with this duty, and that such failure was a substantial factor in causing his injury and death?

In comparison, Kosmos tendered these proposed instructions,

regarding the standard of care of Joey and H&S:

<u>Instruction No. 2: Negligence of Richard Joseph Snyder</u>

It was the duty of the decedent, Richard Joseph Snyder, to exercise ordinary care for his own safety and the safety of others while setting up the rigging and working on the barge loadout spout at the Kosmos Cement Plant on August 9, 2016. "Ordinary care" means such care as the jury would expect an ordinary prudent person to exercise under similar circumstances. In addition to this general duty, as a certified rigger, Mr. Snyder was responsible for complying with all safety standards associated with rigging the loadout spout and replacing the sheaves of which you have heard testimony.

Are you satisfied from the evidence that Mr. Snyder failed to follow safety standards associated with rigging and the work being performed on August 9, 2016, and that such failure was a substantial factor in causing his death?

Are you satisfied from the evidence that the decedent, Richard Joseph Snyder, failed to comply with his duty to exercise ordinary care, and that such failure was a substantial factor in causing his death?

-34-

<u>Instruction No. 5: Negligence of Huelsman & Sweeney</u>
<u>Construction</u>

It was the duty of Third-Party Defendant, Huelsman & Sweeney Construction, Inc., by and through its agents and employees to exercise ordinary care when performing services at the Kosmos cement plant including work performed on the loadout spout and flange of which you have heard testimony and to additionally provide proper training, supervision, warning and assistance to its agents and employees working at the plant to avoid injury.  "Ordinary care" means such care as the jury would expect an ordinary prudent person to exercise under similar circumstances.

Do you believe based upon the evidence that Huelsman & Sweeney Construction, Inc. failed to exercise ordinary care when performing services at the Kosmos cement plant including work performed on the loadout spout and flange and failed to provide proper training, supervision, warning and assistance to those working at the plant to avoid.

The instructions given are not substantially different than the instructions proposed by Kosmos, as the main theme in both sets is the duty of ordinary care.  Kosmos's instructions merely give more detail as to what that entails for Joey and H&S as independent contractors working at the Kosmos plant.

"Kentucky long-ago adopted a bare-bones approach to jury instructions. This Court has explained this approach as demanding that jury instructions provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire." *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 723 (Ky. 2020) (internal quotation marks omitted).  "'Bare

-35-

bones' instructions are proper if they correctly advise the jury about what it must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof on that issue." *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005) (internal quotation marks omitted).

In *Olfice*, the plaintiff wanted to emphasize his status as a business invitee and include additional duties based on this status into the jury instructions. *Id.* at 230. However, the Kentucky Supreme Court said:

> In *Rogers*, we considered instructions in a negligence case that contained several specific duties in addition to the general duty to exercise ordinary care. [*Rogers v. Kasdan*, 612 S.W.2d 133, 135 (Ky. 1981)]. While these specific duties were intended to inform the jury what the defendant should have done to meet the ordinary care requirement, we rejected such an approach because the additional duties were not necessary to the dispositive question of whether the defendant had breached the duty of ordinary care. *Id.* at 136. "[I]nstructions should not make a rigid list of ways in which a defendant must act in order to meet his duty." *Id.* Likewise, Wilkey's proposed instructions were unnecessary under the "bare bones" approach because they created factors for the jury to consider when answering the larger issue of breach of ordinary care.

*Id.*

We find the instructions tendered by Kosmos and the arguments made to be analogous to those in *Olfice*. The question to be answered is if the jury instructions misstated the law. *Norton Healthcare, Inc.*, 600 S.W.3d at 724. We determine that the jury instructions here did not misstate the law, and they

-36-

accurately informed the jury what it needed to believe from the evidence to render

a verdict. Kosmos had the opportunity to give more detail in its closing argument.

Kosmos next argues the circuit court should not have given a "missing

evidence" instruction. The given instruction is as follows:

Instruction No. 4

> If you believe from the evidence that any documents or
> tangible evidence regarding safety, maintenance, factual
> information, or tangible evidence regarding the incident
> existed, and if you further believe from the evidence that
> Kosmos Cement Company intentionally and in bad faith
> lost or destroyed those documents or evidence, you may,
> but are not required to, infer that the documents or
> evidence would be, if available, adverse to Kosmos
> Cement Company and favorable to the other parties.

The "missing evidence" that is referenced by this instruction is Safety

Improvement Cards (SIC cards) and daily inspection sheets that were testified to

by several witnesses. SIC cards are physical cards that are filled out by employees

when they notice a safety issue that needs to be addressed. These cards are turned

in to management. There was an incentive program for employees to turn in these

cards, as employees could receive bonuses for doing so. The daily inspection

sheets are daily forms employees were supposed to complete once they had

performed their inspection of the equipment or area where they were to work that

day.

Plaintiffs requested copies of these inspection forms and SIC cards prior to the lawsuit being filed. They were a frequent topic of the parties' discovery disputes and during the trial. There was conflicting testimony as to what happened to these documents and why they were not provided. Some of the employees testified that while the inspection sheets were supposed to be filled out regularly, many times they were not. As for the SIC cards, there was testimony that once the information was inputted into Kosmos's computer system, the physical cards were destroyed.

Kosmos was ordered to produce all computer files in a format readable by the Snyders on May 1, 2023. Despite this, and the testimony that all SIC card information was entered into Kosmos's system, the Snyders apparently were never able to access any information from the SIC cards, either in physical or electronic formats.

Nick Wolfe had kept copies of nine inspection forms he filled out, and he provided those to MSHA, as well as to the Snyders' counsel. Those were the only inspection forms the Snyders ever received. Wolfe testified that he began to keep copies of his documents after a supervisor attempted to blame him for an event that occurred at the Kosmos plant. He wanted proof he was doing the inspections and documenting as required. He stated he always turned these forms in to Kosmos. Wolfe also testified that Wayne Amburgey would sometimes just

throw these documents away. Amburgey denied doing so but had no explanation for where the documents went or why they were not provided.

Shannon Graves, the Continuous Improvement Manager at Kosmos, testified she was unaware where the inspection sheets would have gone, or why the Snyders would not have received them. She did not believe Kosmos would destroy them, but she had no answer as to why they were not provided.

> Relying, in large part, on *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783 (Ky. 2011), the Supreme Court further stated:

>> The trial court is within its discretion to give a missing-evidence instruction when: (1) the evidence is material or relevant to an issue in the case; (2) the opponent had "absolute care, custody, and control over the evidence;" (3) the opponent was on notice that the evidence was relevant at the time he failed to produce or destroyed it; and (4) the opponent, "utterly without explanation," in fact failed to produce the disputed evidence when so requested or ordered. In so finding, we noted . . . that "nonproduction alone 'is sufficient by itself to support an adverse inference even if no other evidence for the inference exists.'"

> *Disselkamp*, 600 S.W.3d at 731 (footnotes omitted). "In fact," said the Supreme Court, "the *Beglin* court explicitly declined to adopt 'a special rule for measuring the quantum or quality of evidence that will authorize a missing evidence instruction.' *Beglin*, 375 S.W.3d at 790. Instead, the *Beglin* court opted for a flexible standard that grants wide discretion to the trial court." *Id.* at 730 n.112. We keep these flexible standards in

mind as we assess whether the circuit court abused this wide discretion in denying the missing evidence instruction.

*Curtis v. Price Holdings, Inc.*, 610 S.W.3d 339, 346 (Ky. App. 2020) (cleaned up).

Kosmos argues this burden was not met. Incredibly, its main argument is that the Snyders were unable to prove that any additional SIC cards or inspection forms ever even existed, despite the testimony that inspection forms were meant to be filled out daily and SIC cards filled out weekly. The Snyders were provided nine inspection forms for a period of approximately 18 months, and those are the forms that were provided by Nick Wolfe. Kosmos stated:

> Plaintiffs had zero evidence that any additional inspection forms had been created or were missing; they also had no evidence that, even if an indeterminate number of forms from indeterminate periods were "missing" after the accident that: Kosmos knew that the reports were relevant to the accident at the time they went "missing"; those "missing" reports would provide material information different than the reports provided; or such allegedly "missing" forms were due to anything other than negligence.[6]

They later state, "The accident did not occur because the spout broke. It occurred because of decisions made during the repairs."[7] But that was an ultimate jury question. The Snyders' entire case, including the claim for punitive

---

[6] Appellant Brief, Page 27.

[7] *Id.* at Page 28.

-40-

damages, focused on Kosmos's negligence not only on the date of Joey's death, but how it failed to prioritize safety and maintenance before that event which led to that event. These inspection reports and SIC cards may very well have had relevance in illustrating if equipment was being maintained and safety concerns were being taken seriously by Kosmos.

> In light of these important rationales—evidentiary and deterrent—when the evidence is missing "utterly without explanation," and where, as in the instant case, the party who has lost it had absolute care, custody, and control over the evidence, we believe that the better practice is to treat missing evidence like any other evidentiary issue, and refrain from placing an enhanced burden upon the opposing party to obtain the instruction. We therefore adopt no special rule for measuring the quantum or quality of evidence that will authorize a missing evidence instruction. A trial court may use normal inferences and suppositions, and may rely upon circumstantial evidence in deciding whether to admit missing evidence testimony or give a corresponding instruction. In other words, the standard is as typical as with any other issue.

*Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 790 (Ky. 2011) (footnote omitted). Like in *Beglin*, we do not believe the circuit court abused its discretion or otherwise erred in giving the missing evidence instruction. The evidence was that employees were meant to fill out daily inspection forms. Only Kosmos management would have possession and control of the forms, once they were submitted. There was at least some testimony that forms were thrown away, although it was denied. The Snyders' counsel sent a letter to Kosmos prior to

-41-

litigation, advising them to maintain these documents. Further, the circuit court gave the instruction that was explicitly approved by the Kentucky Supreme Court in *Beglin*. These instructions allowed, but did not require, the jury to make an inference that the information would be adverse to Kosmos, but only if they found that Kosmos intentionally and in bad faith lost or destroyed the documents.

## PUNITIVE DAMAGES

Kosmos argues there was insufficient evidence to support instructions for or an award of punitive damages, and it therefore should have received a directed verdict as to punitive damages. "Upon appellate review, we are constrained to view the sufficiency of the evidence in the light most favorable to the verdict. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence." *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 868 (Ky. 2016). Notably, Kosmos does not challenge the *amount*[8] of the award of punitive damages; they argue punitive damages should not have been considered at all.

Punitive damages may be awarded when the evidence satisfies the common law standard of gross negligence. *Id.* at 870. Gross negligence means negligence "accompanied by wanton or reckless disregard for the lives, safety, or

---

[8] We find no argument advanced by Kosmos on appeal about any of the amounts of damages awarded. Thus, Kosmos has waived or abandoned any argument about excessiveness of the awards. *See Osborne v. Payne*, 31 S.W.3d 911, 916 (Ky. 2000).

property of others." *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013). "It is not necessary that the jury find the defendant to have acted with express malice; rather, it is possible that a certain course of conduct can be so outrageous that malice can be implied from the facts of the situation." *Kinney v. Butcher*, 131 S.W.3d 357, 359 (Ky. App. 2004).

The jury in this case was presented with sufficient evidence to find that Kosmos acted with such reckless disregard for the safety of others sufficient to warrant a punitive damages instruction and award. It heard an abundance of evidence that Kosmos disregarded safety concerns of its employees. The jury was told, not only by the union employees but by management employees of Kosmos, that there was no preventative maintenance schedule for much of the equipment at the plant. It was told of a culture that prioritized production and profits over safety and maintenance. The jury heard of multiple instances where Kosmos ignored many of its own policies and procedures. The jury was informed of retaliation against employees who reported safety concerns at the plant.

As to the accident in question, a large industrial piece of equipment was allowed to operate with only three of eight bolts securing it, as well as having seven to ten tons of excess weight on it due to the accumulation of dried cement that had not been cleaned off. "If there was *any* evidence to support an award of punitive damages, a plaintiff has a right to have the jury instructed on the option to

award punitive damages." *Gersh v. Bowman*, 239 S.W.3d 567, 573 (Ky. App. 2007) (citing *Shortridge v. Rice*, 929 S.W.2d 194, 197 (Ky. App. 1996)). From the totality of the testimony and other evidence presented, the jury could certainly have inferred that Kosmos committed gross negligence.

## H&S'S DIRECTED VERDICT

Kosmos's final allegation is that the circuit court erred in directing a verdict in H&S's favor on Kosmos's indemnification claim, and further erred by allowing H&S to be excused from the courtroom for the remainder of the trial. The directed verdict was granted after the Snyders had concluded their case in chief, but prior to Kosmos presenting its evidence. H&S was allowed to be absent for the remainder of the trial. Kosmos also claims the circuit court prejudiced Kosmos when it made statements instructing its counsel to "sit down" several times during the Snyders' counsel's closing argument.

First, Kosmos claims the circuit court erred in granting a directed verdict to H&S, but it does not present an argument as to its reasoning; it merely presents a conclusory statement that it was error. "Such a terse, conclusory assertion wholly unaccompanied by meaningfully developed argument or citation to authority is insufficient to merit appellate relief." *Schell v. Young*, 640 S.W.3d 24, 32 (Ky. App. 2021). We therefore decline review of this decision at length.

-44-

Remember that H&S was found not negligent by the jury essentially negating the indemnity claims anyway.

Kosmos then complains of the circuit court's statements directed to its counsel during the Snyders' closing arguments. The supposedly offending statements occurred after Kosmos's counsel objected multiple times during the Snyders' closing. After the fourth objection, the circuit court told Kosmos's counsel to "sit down" three times, and to "appeal me"[9] when counsel continued to argue with the judge regarding the objection. Kosmos argues this was inherently prejudicial and entitled them to a mistrial, so they now ask for a new trial on this basis.

"It is well established that the decision to grant a mistrial is within the trial court's discretion, and such a ruling will not be disturbed absent a showing of an abuse of that discretion." *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004). Kosmos has cited *Commonwealth, Dep't of Highways v. Eubank*, which stated that the "Court has condemned as prejudicial improper comments of a trial judge made in the presence of a jury." 369 S.W.2d 15, 16 (Ky. 1963). The facts of *Eubank* and the statements made herein are vastly different. In *Eubank*, the trial court judge commented on the credibility of an expert witness, indicating it

---

[9] VR, 6/29/23, 1:36:44-1:36:55 PM

regarded Appellee's expert's testimony more highly than Appellants' expert's testimony, thereby invading the jury's function of evaluating the evidence. *Id.*

The second case cited by Kosmos is *Rose v. Vasseur*, 358 S.W.2d 540 (Ky. 1962). Kosmos cites the phrase "undue importance and great weight may be attached by the members of the jury to any remark made by him in their presence" in its brief, and further states that the court reversed judgment due to "manifestation of animosity toward party's attorney." *Id.* at 542. While it is accurate that the Court in *Rose* did reverse the judgment based on prejudicial statements of the trial court judge made in the presence of the jury, it is not entirely accurate to portray the reversal as due to only animosity toward a party's attorney.

Just prior to the cited quote, the opinion reads "We do not condone any of the judge's display of annoyance and displeasure before the jury *but it is the last of the quoted statements that gives us concern.* We have no doubt that the trial judge's remarks could fairly be construed as an unfavorable comment on the merits of the case before him." *Id.* (emphasis added). It is clear that it was not just the (multiple) statements of annoyance at one party's attorney that led to the reversal, but the remarks of the judge that hinted at the *merits* of the case. No such statement occurred here.

Frankly, the judge showed remarkable patience with this attorney throughout the case. Further, just prior to this final interaction taking place, the

circuit court included, in its jury instructions, an admonishment to "disregard any perception you may have that the court was inclined to favor the claims of any party to this case."[10] It is presumed that jurors follow the admonitions of the trial court. *Ross v. Commonwealth*, 531 S.W.3d 471, 478 (Ky. 2017). Further, this was one brief interaction made during the course of a fourteen-day trial. When determining if a judge's actions can be deemed prejudicial to the point of warranting a new trial, the entire context of the trial should be taken into consideration. *See Transit Authority of River City (TARC) v. Montgomery*, 836 S.W.2d 413, 416 (Ky. 1992). We do not believe the circuit court's statements during the Snyders' closing arguments rose to that level, and it did not abuse its discretion in denying Kosmos's motion for a mistrial.

### Cross-Appeal 2024-CA-0007

The Snyders filed a cross-appeal in this action, seeking limited relief from the circuit court's orders. First, it challenges the granting of summary judgment to Kosmos on Richard and Karen Snyder's loss of parental consortium claim. Next, it requests a reversal of the circuit court on its post-trial motions.

### PARENTAL LOSS OF CONSORTIUM CLAIM

Prior to the trial, Kosmos moved for summary judgment on Richard and

---

[10] VR, 6/29/23, 10:17:34 AM.

Karen Snyder's loss of parental consortium claim under KRS 411.135, which the circuit court granted. The Snyders are challenging the constitutionality of KRS 411.135, and they have notified the Attorney General as required by KRS 418.075. The Attorney General's office did not file a brief in this action.

"In reviewing the constitutionality of a statute, we apply a *de novo* standard of review." *S.W. v. S.W.M.*, 647 S.W.3d 866, 873 (Ky. App. 2022) (internal quotation marks omitted). "In considering an attack on the constitutionality of legislation, this Court has continually resolved any doubt in favor of constitutionality rather than unconstitutionality." *Id.* (citing *Hallahan v. Mittlebeeler*, 373 S.W.2d 726, 727 (Ky. 1963)). "When reviewing a trial court's grant of summary judgment, we determine whether the record supports the trial court's conclusion that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to the trial court's assessment of the record or its legal conclusions." *Foreman v. Auto Club Property-Casualty Insurance Co.*, 617 S.W.3d 345, 349 (Ky. 2021) (internal quotation marks and footnotes omitted).

KRS 411.135 states: "In a wrongful death action in which the decedent was a minor child, the surviving parent, or parents, may recover for loss

of affection and companionship that would have been derived from such child during its minority, in addition to all other elements of the damage usually recoverable in a wrongful death action."

The Snyders argue that there is no rational basis for any distinction between the loss suffered by a parent due to the death of a child, regardless of whether the child is an adult or a minor. They also allege the age limitation violates the jural rights provisions in sections 14, 54, and 241 of the Kentucky Constitution. We find neither argument to have merit.

The Snyders point to *Giuliani v. Guiler*, 951 S.W.2d 318 (Ky. 1997), in which the Kentucky Supreme Court recognized an action for loss of parental consortium by minor children. The Supreme Court believed "there is no legal distinction between the claim of a parent for loss of a child's consortium from the claim of a child for the loss of a parent's consortium." *Id.* at 321. The Court determined the public policy adopted by the legislature when it enacted KRS 411.135 was consistent with the recognition of a minor child's right to recover for loss of consortium upon the death of a parent. The Snyders argue that their claim is a natural progression of that same logic.

The Snyders further argue that the statute violates the jural rights provision in the Kentucky Constitution because loss of consortium is rooted in common law. They contend the age limit of KRS 411.135 restricts a common law

right. "The jural rights doctrine is not expressly set out in the Kentucky Constitution. Rather, Kentucky courts have held that it flows from a reading of Subsections 14, 54, and 241. In essence, the doctrine states that the General Assembly has no authority to abolish or restrict a common law right of recovery for personal injury or wrongful death. Furthermore, the doctrine applies not only to rights of action existing at the time of the adoption of our Constitution in 1891, but also to actions and remedies which have developed through the common law since the adoption of the Constitution." *Taylor v. King*, 345 S.W.3d 237, 242 (Ky. App. 2010) (citations and footnotes omitted). In *Taylor*, this Court held KRS 413.241(1) unconstitutional because it effectively prohibited recovery of punitive damages against a dram shop based on its own gross negligence.

We find *Taylor* to be distinguishable. The statute deemed unconstitutional in *Taylor* prohibited the award of *any* punitive damages against a dram shop, whereas KRS 411.135 only limits who may recover for a loss of consortium claim. While loss of consortium was a common law claim, historically it was only a claim allowed for spouses. And at common law, loss of consortium claims ended at death. *Martin v. Ohio County. Hosp. Corp.*, 295 S.W.3d 104, 108 (Ky. 2009). When it enacted KRS 411.135, the legislature expanded loss of consortium to include parents' loss of their minor child. It did not curtail an existing common-law right.

While the Snyders present loss of consortium as a common law claim that can only be regulated by the courts, that is not the full picture. "While this Court has not hesitated to take an active role in extending the common law of torts when appropriate, we decline the invitation in the case *sub judice* so as not to invade the province of the Legislature, the branch of our government to which our constitution has granted the sole responsibility for determining who can recover what damages for the wrongful death of another." *Pauly v. Chang*, 498 S.W.3d 394, 415 (Ky. App. 2015) (citations omitted). This Court acknowledged in *Pauly* that "Kentucky statutes do not recognize a parent's claim for loss of consortium with their adult children." *Id.*

*Clements v. Moore*, 55 S.W.3d 838 (Ky. App. 2000), and *Smith v. Vilvarajah*, 57 S.W.3d 839 (Ky. App. 2000), also delineate the parameters of consortium. In both of these cases, adult children brought loss of consortium claims alongside wrongful death actions for the death of their parent. In both cases, this Court declined to extend the claim for loss of parental consortium to adult children. We find these cases, and their rationale, persuasive. "[I]t is the belief of this Court that it is not the proper function of the judiciary to further develop the common law in the area of loss of consortium claims in the context of wrongful death. Rather, the recognition of filial claims for wrongful death is one exclusively within the purview of the Legislature." *Clements*, *supra*, at 840.

The Snyders additionally argue that KRS 411.135 does not *prohibit* a parent from recovering for the death of an adult child. We disagree. The language of the statute explicitly states that surviving parents may recover "in a wrongful death action in which the decedent *was a minor child*." *Id*. (emphasis added). "Under basic principles of statutory construction, we assume that the legislature meant exactly what it said, and said exactly what it meant." *Alliance for Kentucky's Future, Inc. v. Environmental & Public Protection Cabinet*, 310 S.W.3d 681, 690 (Ky. App. 2008).

The distinction between loss of a minor child and an adult child is apparent. As in this case, the adult child has become part of his own family, and the relationship between the parent and adult child is generally less close or dependent. Of course, the loss of an adult child is also devastating, but it is not for this Court to expand the right of recovery in wrongful death cases. KRS 411.135 is constitutional; it does not violate the jural rights doctrine, and the circuit court did not commit error when it granted summary judgment to Kosmos on the claims by Richard and Karen Snyder.

## POST-JUDGMENT MOTIONS

The Snyders claim the circuit court erred in denying its post-

judgment motions.  First, the Snyders renewed their motion for sanctions based on

Kosmos's discovery violations under CR[11] 37.01(d)(i).  This rule states:

> A party, upon reasonable notice to other parties and all
> persons affected thereby, may apply for an order
> compelling discovery as follows:
>
> (d) Award of expenses of motion.
>
> (i) If the motion is granted the court shall, after
> opportunity for hearing, require the party or deponent
> whose conduct necessitated the motion or the party or
> attorney advising such conduct or both of them to pay to
> the moving party the reasonable expenses incurred in
> obtaining the order, including attorney's fees, unless the
> court finds that the opposition to the motion was
> substantially justified or that other circumstances make
> an award of expenses unjust.

Sanctions governed by CR 37 are reviewed for an abuse of discretion.

*Morton v. Bank of the Bluegrass & Trust Co.*, 18 S.W.3d 353, 360 (Ky. App.

1999).  The circuit court determined that in light of the jury's award of $25 million

in punitive damages, it would be unjust to subject Kosmos to further financial

punishment, even if it was otherwise warranted by their conduct.  A trial court is in

the best position to determine if conduct warrants the imposition of sanctions.  *Id.*

It was the circuit court who viewed the entirety of this case, and we cannot say it

abused its discretion when it declined to award sanctions to the Snyders.

---

[11] Kentucky Rules of Civil Procedure.

Finally, the Snyders claim the circuit court erred when it would not allow them to amend their complaint to assert third-party bad faith and UCSPA claims against Kosmos's insurers. The circuit court determined that it lost particular case jurisdiction to allow an amendment under the civil rules. The circuit court's final and appealable judgment on the jury's verdict was entered on July 6, 2023; the Snyders' motion to amend the complaint was not filed until September 20, 2023.

"Jurisdiction is a question of law, and our review is de novo." *Commonwealth v. B.H.*, 548 S.W.3d 238, 242 (Ky. 2018). "Under CR 59.04 and 59.05 the court has control over its judgment with a right to order a new trial, or alter, amend or vacate the judgment, either on motion or *sua sponte*, for ten days after entry of judgment, but not thereafter." *Johnson v. Smith*, 885 S.W.2d 944, 947 (Ky. 1994). The Snyders did not file their motion to amend their complaint until approximately two months after the judgment on the jury verdict was entered. Kosmos had (timely) filed several post-trial motions pursuant to CR 59. The Snyders argue that because Kosmos had several motions pending that had not yet been ruled upon at the time they made their motion to amend their complaint, the circuit court had not lost jurisdiction. Not so.

> Gearhart relies upon *State Personnel Board v. Heck*, Ky. App., 725 S.W.2d 13, 18 (1986), wherein the Court stated that "[a] motion pursuant to CR 59, however, converts a final judgment to an interlocutory judgment.

-54-

CR 73.02(1)(e)." Taken out of context, as Gearhart has done, the quoted portion from *Heck* would appear to support Gearhart's argument. However, the question in *Heck* was whether a *timely* CR 59.05 motion preserved an issue for appeal by bringing it to the trial court's attention before appeal, which is not the issue herein. Moreover, as the reference to CR 73.02(1)(e) establishes, a judgment affected by a CR 59.05 motion is made interlocutory only for purposes of tolling the time for filing a notice of appeal. **It does not authorize a general attack upon, or revision of, the judgment at issue**. *See Whittenberg Engineering* [*& Construction Co. v. Liberty Mutual Ins. Co.*, 390 S.W.2d 877, 884 (Ky. 1965)]; *see also Rodgers v. Berry*, Ky., 346 S.W.2d 43, 44 (1961), wherein it was held that a second motion under CR 59.05 directed to an order overruling a previous motion under CR 59.02 or CR 59.05 would not toll the time for taking an appeal, where the second motion was served more than ten (10) days after entry of judgment. Instead, a trial court loses control of a judgment ten (10) days after the entry of the judgment, except to the extent an authorized, timely motion under CR 59 is made.

*Kentucky Farm Bureau Ins. Co. v. Gearhart*, 853 S.W.2d 907, 910 (Ky. App. 1993) (emphasis added). Kosmos's motions pursuant to CR 59 do not extend the court's jurisdiction to rule on a post-judgment motion that was not timely filed. The Snyders do not receive the benefit of an extension because of Kosmos's filing of a motion that has nothing to do with expanding the lawsuit to include new claims. The circuit court maintained jurisdiction of only those timely-filed motions, not any post-trial motion that just so happened to be filed before a hearing occurred and an order issued.

"The appellants maintain that authority to permit the amended complaints to be filed is found in CR 15.01. We think it is obvious that this Rule applies only to amendments offered during the pendency of the action. Certainly, it was not intended to apply in situations where, by the lapse of a period of 10 days after judgment, the court has lost control of the judgment." *James v. Hillerich & Bradsby Co.*, 299 S.W.2d 92, 94 (Ky. 1956).

The circuit court did not err in disallowing the Snyders to file an amended complaint to add new parties and entirely new claims post-jury verdict and judgment; the circuit court had lost jurisdiction to do so ten days after its entry of a final judgment. Also, the Snyders point to no reason why they could not have filed a separate suit to litigate these separate claims, claims which they did not choose to assert in this case prior to trial with required bifurcation[12] before the underlying claim had been determined. This may have been because the trial result then provided in their eyes further evidence to support such claims, but again they were not prejudiced by the decision not to lengthen this particular case further with opening a whole new and separate set of claims.

## CONCLUSION

Although we have rendered an unusually long Opinion in this case, we have not commented at full length on everything raised by the parties. To the

---

[12] *See generally Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993).

extent we have not discussed any of the contentions raised as much as the parties may have liked should not be taken as an indication of disregarding them. We have found no merit in any other issues which we have not specifically addressed. While no trial of such duration is likely to have been perfect, we firmly believe that the result of this trial is trustworthy, and nothing compels a reversal of the result. For all the foregoing reasons, the judgment of the Jefferson Circuit Court is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANTS
LOUISVILLE CEMENT ASSETS
TRANSITION COMPANY F/K/A
KOSMOS CEMENT COMPANY,
CEMEX, INC., AND LONE STAR
INDUSTRIES, INC.:

Bethany A. Breetz
Louisville, Kentucky

David F. Cooney
Fort Lauderdale, Florida

Richard W. Edwards
Louisville, Kentucky

BRIEF FOR APPELLEE PEBCO,
INC.:

Zachary C. Hoskins
John R. Martin, Jr.
Louisville, Kentucky

BRIEF FOR APPELLEE
HUELSMAN & SWEENEY
CONSTRUCTION, INC.:

Kathleen E. Watson
Denis C. Wiggins
Stephen C. Keller
Louisville, Kentucky

BRIEF FOR APPELLEES/CROSS-
APPELLANTS JESSICA SNYDER,
AS ADMINISTRATRIX OF THE
ESTATE OF RICHARD JOSEPH
SNYDER, AS NATURAL MOTHER
AND NEXT FRIEND OF AVA
SNYDER AND SEAN SNYDER,
ALISSA SNYDER, JESSICA
SNYDER, KAREN SNYDER, AND
RICHARD SNYDER:

Kevin C. Burke
Jamie K. Neal
Louisville, Kentucky

Chadwick N. Gardner
John C. Grey, II
Savannah R. Nolan
Prospect, Kentucky